UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARSH & MCLENNAN AGENCY LLC, | |
| Plaintiff, | Civil Action No. _____ |
| vs. | |
| DONALD DRENNAN WILLIAMS, JR., PHILLIP ANDREW BLANKENSHIP, CHARLES ANDERSON, LINDSEY LUKETIC, | **COMPLAINT** |
| Defendants. | |

Plaintiff Marsh & McLennan Agency LLC, inclusive of its affiliates JSL (as defined below) and MMA Securities, LLC ("MMA"), by its attorneys, Jackson Lewis P.C., for its Complaint for Injunctive Relief and Damages against Defendants Donald Drennan Williams, Jr. ("Williams"), Phillip Andrew Blankenship ("Blankenship"), Charles Anderson ("Anderson"), and Lindsey Luketic ("Luketic") (collectively referred to as "Defendants"), states as follows:

## INTRODUCTION

1.      Despite having sold their business relationships with clients to Plaintiff and its predecessor, Defendants wrongfully stole those clients and revenue away from MMA, inclusive of its affiliates JSL and MMA Securities, LLC.  Defendants established a competing entity while still employed by Plaintiff, surreptitiously cleaned their offices, packed boxes full of MMA confidential documents and information, and loaded their SUV's the weekend of June 11-12, 2022, *and thereafter* resigned en masse with the rest of their team early Monday morning, June 13, 2022. Within hours of their resignations – and while certain of Defendants and the team members were serving their notice periods – Defendants emailed these same clients, falsely misrepresenting their

new venture as a "re-branding."  Defendants further greased their theft of business by emailing to themselves client lists and other items of confidential information in the weeks leading up to their coordinated resignations.  Defendants are jointly and severally liable for damages arising from their breaches of agreements, misappropriation of confidential information, and unfair competition, as well as punitive damages for their brazen conduct.

## PARTIES AND RELEVANT NON-PARTY

2.     MMA is a Delaware corporation with its principal place of business located in White Plains, New York.

3.     Williams is an individual who, upon information and belief, resides at 327 Stonegate Drive, Birmingham, AL 35242. Williams is a former employee of MMA, and a current employee of Advo(k)ate Advisors, LLC ("Advo(k)ate").

4.     Blankenship is an individual who, upon information and belief, resides at 4179 Cliff Road South, Birmingham, AL 35222. Blankenship is a former employee of MMA, and a current employee of Advo(k)ate.

5.     Anderson is an individual who, upon information and belief, resides at 6449 Highway 39, Chelsea, AL 35043.  Anderson is a former employee of MMA, and, upon information and belief, is a current employee of Advo(k)ate.

6.     Luketic is an individual who, upon information and belief, resides at 1829 Highfield Drive, Vestavia, AL 35216.  Luketic is a former employee of MMA, and a current employee of Advo(k)ate.

7.     Non-party Advo(k)ate is a Delaware limited liability company located in Birmingham, AL.

8.     Advo(k)ate was formed in or about October 2020, and registered to do

business in Alabama on or about May 16, 2022, by Williams.

9.      MMA and Advo(k)ate are competitors.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 and 18 U.S.C. §1836(c) by virtue of the claims herein arising under the Defend Trade Secrets Act of 2016 and pursuant to 28 U.S.C. §1367 by virtue of MMA's state law claims being so related to claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

11.     This Court also has subject matter jurisdiction over this matter based on diversity of citizenship pursuant to 28 U.S.C. §1332 because Plaintiff is a citizen of New York and Defendants are citizens of Alabama, and the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

12.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because the Non-Solicitation and Confidentiality Agreements signed by each of the defendants upon commencement of employment with MMA, which are the subject of the breach of contract claims set forth herein, contain a Governing Law and Choice of Forum provision, designating courts in New York County or the United States District Court for the Southern District of New York as the exclusive venue for resolution of disputes between the parties.  Further, MMA maintains its principal place of business in New York.

## BACKGROUND

13.     MMA is a risk, insurance, and employee benefits services firm, providing risk management, risk consulting, insurance brokerage, financial solutions, and benefits program management services, including third party administration services, for businesses, public entities,

associations, professional services organizations, and private clients.

14.     MMA delivers retirement and wealth management services to its clients through its regulated broker dealer and investment advisor affiliates, including JSL Securities, Inc. and MMA Securities, LLC.

15.     JSL Securities, Inc. is a subsidiary of MMA, and a registered broker dealer which provides, *inter alia*, services to 401(K) and similar employee benefit plans maintained by MMA clients as retirement savings vehicles for their employees.

16.     MMA Securities, LLC is a subsidiary of MMA, and a registered broker dealer and investment adviser which provides, *inter alia*, services to 401(K) and similar employee benefit plans maintained by MMA's clients as retirement savings vehicles for their employees. Anderson, Williams & Co. was engaged in the same business as MMA and Advo(k)ate.

17.     Donald Drennan Williams, Sr. ("Drennan") was an owner or partner of Anderson, Williams & Co.  Drennan is deceased.

18.     Upon information and belief, all Defendants and Drennan were employed by Anderson, Williams & Co., prior to March 1, 2007.

19.     On or about March 1, 2007, J. Smith Lanier & Co. and JSL Securities, Inc. ("JSL") entered into an Asset Purchase Agreement with Drennan and Anderson, whereby JSL acquired, for a substantial sum, the assets of Drennan and Anderson, including but not limited to goodwill, customer lists and information, as well as "the right to service and receive all revenue with respect to each of the individual customers and customer accounts underlying the commission income and other revenue reflected on all of the commission statements of [Drennan and Anderson] . . . ."

20.     On or about March 1, 2007, JSL entered into a similar Asset Purchase

Agreement with Williams, whereby JSL acquired the assets of Williams, including but not limited

to goodwill, customer lists and information, as well as "the right to service and receive all revenue

with respect to each of the individual customers and customer accounts underlying the commission

income and other revenue reflected on all of the commission statements of [Williams] . . . ."

21.     Upon the acquisition of their business by JSL, Williams, Anderson, and

Drennan became employees of JSL.

22.     Upon commencement of employment with JSL, Williams, Anderson, and

Drennan entered into employment agreements with JSL containing, among other provisions, post-

employment restrictive covenants prohibiting the solicitation and servicing of accounts.

23.     On or about January 13, 2017, for a substantial sum, MMA acquired through

merger all of JSL, including JSL Securities, Inc., and including JSL's client accounts and goodwill.

24.     Upon the merger of JSL into MMA, Defendants and Drennan each became

employees of MMA, and JSL Securities, Inc. became a subsidiary of MMA.

### DEFENDANTS' AGREEMENTS WITH MMA

25.     Upon commencement of employment with MMA, each of the Defendants

and Drennan signed an agreement titled, "JSL, A Marsh & McLennan Agency LLC Company

Non-Solicitation and Confidentiality Agreement" ("NSA").

26.     By the NSA, each of the Defendants and Drennan agreed to the following

non-solicitation of clients provision:

> (a)     Employee acknowledges and agrees that solely by reason of employment
> by Employer, including its predecessor, JSL, Employee has and will come
> into contact with and develop and maintain relationships with a significant
> number of the Company's clients and prospective clients, and will have
> access to Confidential Information and Trade Secrets relating thereto,
> including those regarding the Company's clients, prospective clients and
> related information.

(b)     Consequently, Employee covenants and agrees that in the event of separation from employment with the Employer, whether such separation is voluntary or involuntary, Employee will not, for a period of two (2) years following such separation, directly or indirectly: (i) solicit clients or prospective clients of the Company for the purpose of selling or providing consulting services or projects, or selling products, of the type sold or provided by Employee while he or she was employed by the Company; (ii) induce clients or prospective clients of the Company to terminate, cancel, not renew, or not place business with the Company, (iii) perform or supervise the provision or performance of services or projects or provision of products of the type sold or provided by Employee while he or she was employed by the Company on behalf of any clients or prospective clients of the Company, or (iv) assist others to do the acts specified in Sections 1(b)(i)-(iii). For the avoidance of doubt, the restriction set forth in this Section 1 applies to those clients or prospective clients of the Company, including its predecessor, JSL, and with which Employee had contact or about whom Employee obtained Confidential Information and Trade Secrets during the last two (2) years of his or her employment with the Company. For the purposes of this Section 1, the term "contact" means interaction between Employee and the client, which takes place to further the business relationship, or making (or assisting or supervising the performance or provision of) sales to or performing or providing (or assisting or supervising the performance or provision of) services, products or projects for the client on behalf of the Company. For purposes of this Section 1, the term "contact" with respect to a "prospective" client means interaction between Employee and a potential client of the Company that takes place to obtain the business of the potential client on behalf of the Company. It shall not be a defense to a claim that this Section has been breached that Employee's new employer or entity for which Employee is performing services has previously solicited or served the client. Employee shall not engage in any subterfuge to circumvent this prohibition, including, but not limited to accompanying others on calls to the client, contacting the client with other persons, supervising other persons in soliciting or serving the client, providing Confidential Information and Trade Secrets to others to assist them in soliciting or serving the client, participating in developing presentations to be made to the client, or other similar activities.

27.     By the NSA, each of the Defendants and Drennan agreed to the following non-solicitation of employees provision:

Employee acknowledges and agrees that solely as a result of employment with the Company, and in light of the broad responsibilities of such employment which include working with other employees of the Company, Employee has and will come into contact with and acquire Confidential Information and Trade Secrets regarding the Company's other employees[]. Accordingly, both during

6

employment with the Company and for a period of two (2) years thereafter, Employee shall not, either on Employee's own account or on behalf of any person, company, corporation, or other entity, directly or indirectly, solicit, or endeavor to cause any employee of the Company with whom Employee, during the last two (2) years of his or her employment with the Company, came into contact for the purpose of soliciting or servicing business or about whom Employee obtained Confidential Information and Trade Secrets to leave employment with the Company.

28.     By the NSA, each of the Defendants and Drennan acknowledged that they would learn and have access to Confidential Information and Trade Secrets belonging to the Company. The NSA provides:

> Employee understands and acknowledges that: (i) as an employee of the Company he or she will learn or have access to, or may assist in the development of, highly confidential and sensitive information and trade secrets about the Company, its operations and its clients; and (ii) providing its clients with appropriate assurances that their confidences will be protected is crucial to the Company's ability to obtain clients, maintain good client relations, and conform to contractual obligations.

> For the purposes of this Agreement, "Confidential Information and Trade Secrets" shall consist of and include but are not limited to: (i) financial and business information relating to the Company, such as information with respect to costs, commissions, fees, profits, sales, markets, mailing lists, strategies and plans for future business, new business, product or other development, potential acquisitions or divestitures, and new marketing ideas; (ii) product and technical information relating to the Company, such as product formulations, new and innovative product ideas, methods, procedures, devices, machines, equipment, data processing programs, software, software codes, computer models, and research and development projects; (iii) client information, such as the identity of the Company's clients, including those of Employer's predecessor JSL, the names of representatives of the Company's clients responsible for entering into contracts with the Company, the amounts paid by such clients to the Company, specific client needs and requirements, specific client risk characteristics, policy expiration dates, policy terms and conditions, information regarding the markets or sources with which insurance is placed, and leads and referrals to prospective clients; (iv) personnel information, such as the identity and number of the Company's other employees and officers, including employees of Employer's predecessor JSL, their salaries, bonuses, benefits, skills, qualifications, and abilities; (v) any and all information in whatever form relating to any client or prospective client of the Company, including but not limited to, its business, employees, operations, systems, assets, liabilities, finances, products, and marketing, selling and operating practices; (vi) any information not included in (i) or (ii) above which Employee knows or should know is subject to a restriction on disclosure or which Employee

knows or should know is considered by the Company or the Company's clients or prospective clients to be confidential, sensitive, proprietary or a trade secret or is not readily available to the public; (vii) Intellectual Property (as defined below); or (viii) Copyrightable Works (as defined below). Confidential Information and Trade Secrets are not generally known or available to the general public, but have been developed, compiled or acquired by the Company at its great effort and expense. Confidential Information and Trade Secrets can be in any form, including but not limited to: oral, written or machine readable, including electronic files.

For purposes of this Agreement, "Intellectual Property" shall include, but not be limited to, all inventions, designs, specifications, formulations, products, discoveries, articles, reports, models (computer or otherwise), processes, methods, frameworks, methods of analysis, systems, techniques, trademarks, service marks, names, trade secrets, concepts and ideas, the expressions of all concepts and ideas, creations, work product or contributions thereto, computer programs, software, data processing systems, improvements, and all modifications and developments with respect to the foregoing, and know-how related thereto, whether or not any such Intellectual Property is eligible for patent, trademark, copyright, trade secret or other legal protection, and regardless of whether containing or constituting Confidential Information and Trade Secrets as defined in this Section 4. . . .

29.     By the NSA, each of the Defendants and Drennan agreed to the following non-disclosure of confidential information provision:

Employee acknowledges and agrees that the Company is engaged in a highly competitive business and that its competitive position depends upon its ability to maintain the confidentiality of the Confidential Information and Trade Secrets which were developed, compiled and acquired by the Company at its great effort and expense. Employee further acknowledges and agrees that any disclosing, divulging, revealing, or using of any of the Confidential Information and Trade Secrets, other than in connection with the Company's business or as specifically authorized by the Company, will be highly detrimental to the Company and cause it to suffer serious loss of business and pecuniary damage. Accordingly, Employee agrees that he or she will not, while associated with the Company and for so long thereafter as the pertinent information or documentation remains confidential, for any purpose whatsoever, directly or indirectly use, disseminate or disclose to any other person, organization or entity Confidential Information or Trade Secrets, except as required to carry out his duties as an employee of the Company, and except as expressly authorized by the President or highest executive officer of the Employer. Employee understands that nothing in this Agreement is intended to prohibit him or her from discussing with other employees, or with third parties who are not future employers or competitors of the Company, wages, hours, or other terms and conditions of employment.

Employee understands that under the federal Defend Trade Secrets Act of 2016,

s/he shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made to Employee's attorney in relation to a lawsuit for retaliation against Employee for reporting a suspected violation of law; or (c) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. . . .

30.    By the NSA, each of the Defendants and Drennan agreed to return all MMA property, including MMA Confidential Information and Trade Secrets, in their possession at the time of termination.  The NSA provides:

Immediately upon the termination of employment with the Company for any reason, or at any time the Company so requests, Employee will return to the Company: (i) any originals and all copies of all files, notes, documents, slides (including transparencies), computer disks, printouts, reports, lists of the Company's clients or leads or referrals to prospective clients, and other media or property in Employee's possession or control which contain or pertain to Confidential Information and Trade Secrets; and (ii) all property of the Company, including, but not limited to, supplies, keys, access devices, books, identification cards, computers, telephones and other equipment. Employee agrees that upon completion of the obligations set forth in this Section 6, and if requested by the Company, he or she will execute a statement declaring that he or she has retained no property of the Company or materials containing Confidential Information and Trade Secrets nor has he or she supplied the same to any person, except as required to carry out his or her duties as an employee of the Company. A receipt signed by an Officer of the Employer itemizing the returned property is necessary to demonstrate that Employee has returned all such property to the Company.

31.    By the NSA, each of the Defendants and Drennan agreed to the following enforcement provision:

In recognition of the fact that irreparable injury will result to the Company in the event of a breach by Employee of his or her obligations under Section 1, 2, 3, 4, 5, 6, 7 or 8 of this Agreement, that monetary damages for such breach would not be readily calculable, and that the Company would not have an adequate remedy at law therefor, the Employee acknowledges, consents and agrees that in the event of such breach, or the threat thereof, the Company shall be entitled, in addition to any other legal remedies and damages available, to (a) specific performance thereof and to temporary and permanent injunctive relief (without the necessity of posting a bond) to restrain the violation or threatened violation of such obligations by Employee and persons acting for or in connection with Employee and (b) recovery

of all reasonable sums and costs, including attorneys' fees, expert witness fees, expenses and costs incurred by the Company in investigating or seeking to enforce the provisions of this Agreement.

The restrictive periods set forth in this Agreement (including those set forth in Sections 1, 2 and 5 hereof) shall not expire and shall be tolled during any period in which Employee is in violation of such restrictive periods, and therefore such restrictive periods shall be extended for periods equal to the durations of Employee's violations thereof.

32.     By the NSA, each of the Defendants and Drennan consented to jurisdiction

in New York, and venue in this Court.  The NSA provides:

The parties acknowledge that the Company is headquartered in New York, that senior members of the leadership team of the Company are located in New York, and that a breach of this Agreement will cause injury in New York. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to its conflict of laws provisions. The parties being desirous of having any disputes resolved in a forum having a substantial body of law and experience with the matters contained herein, agree that any action or proceeding with respect to this Agreement and Employee's employment shall be brought exclusively in the Civil Court of the City of New York, New York County, or in the Supreme Court of the State of New York, New York or in the United States District Court for the Southern District of New York or in such other courts of appropriate jurisdiction sitting in the State and County of New York, New York and the parties agree to the jurisdiction thereof. The parties hereby irrevocably waive any objection they may now or hereafter have to the laying of venue of any such action in the said court(s), and further irrevocably waive any claim they may now or hereafter have that any such action brought in said court(s) has been brought in an inconvenient forum. Employee recognizes that, should any dispute or controversy arising from or relating to this Agreement be submitted for adjudication to any court, arbitration panel or other third party, the preservation of the secrecy of Confidential Information and Trade Secrets may be jeopardized. Consequently, Employee agrees that all issues of fact shall be tried without a jury.

## DEFENDANTS' RESIGNATIONS FROM MMA

33.     Each of the Defendants and Drennan voluntarily resigned from employment

with MMA on the morning of Monday, June 13, 2022.

34.     Defendants' and Drennan's respective resignations occurred within minutes

of each other.

35.     Defendants and Drennan coordinated their resignations with each other.

36.     Immediately upon their resignations, Defendants and Drennan were employed by Advo(k)ate.

37.     Defendant Luketic's resignation email stated, "This communication is to provide you with two week notice of my resignation effective 6/27/2022."

38.     Despite this statement, Luketic failed to actually provide two weeks' notice of resignation, failed to respond to MMA, and actually was working for Advo(k)ate immediately upon her resignation.

### **DEFENDANTS' UNLAWFUL COMPETITIVE ACTIVITIES**

#### **Establishment of Advo(k)ate**

39.     While employed by MMA, Defendants solicited each other to leave employment with MMA.

40.     While employed by MMA, Defendants established Advo(k)ate as a competitor of MMA, inclusive of its subsidiary JSL Securities, Inc.

41.     While employed by MMA, on or about Friday, June 10, 2022, Defendants, upon information and belief, caused broker dealer Royal Alliance to de-register MMA, inclusive of its subsidiary JSL Securities, Inc., and simultaneously register Advo(k)ate with Royal Alliance.

#### **Removal of Boxes of Files from MMA**

42.     While still employed by MMA, on Saturday, June 11, 2022, and Sunday, June 12, 2022, Defendants and their family members removed boxes of files from MMA's Birmingham office, loading such boxes into their SUV's.

43.     Upon information and belief, the boxes removed from MMA by Defendants contained client files.

44.     Upon information and belief, the boxes removed by Defendants contained Confidential Information and Trade Secrets belonging to MMA.

45.     Defendants were not authorized to remove these boxes of material or any other material from MMA's premises.

### Removal of SIM Cards

46.     Following their resignations from employment Defendants returned their MMA-issued iPhones, but the SIM cards were removed.

47.     Upon information and belief, Defendants remain in possession of the SIM cards from their MMA-issued devices.

### Williams' Emails to His Personal Gmail Account

48.     While still employed by MMA, Williams sent multiple emails from his MMA email account to his personal Gmail account, rennsworkbacksup@gmail.com, and personal Yahoo account, rennwilliams@yahoo.com, containing client information, sample compliance language, and an article titled "Enforcing non-solicitation agreements."

49.     Between June 3, 2022 and June 12, 2022 – the day before he submitted his voluntary resignation – Williams sent over 25 emails to his personal email account containing MMA client contact information.

50.     For example, Williams sent to his personal email account client contact information alphabetically, collecting client contact information in separate emails by letter.

51.     Additionally, on June 10, 2022, Williams forwarded an email thread to his personal email account containing a client service agreement and check cutting fee information for a particular client.

52.     Further, on June 12, 2022, Williams forwarded an email thread to his personal email account which contained fee agreement and service plan information for another

client.

53.     On June 12, 2022, Williams forwarded to his personal email account a FINRA summary report on JSL and FINRA personal and family information questionnaire forms.

### Blankenship's Emails to His Personal Gmail Account

54.     During the weeks immediately preceding his voluntary resignation from MMA, Blankenship regularly sent client information and other MMA Confidential Information and Trade Secrets data to his personal email account, pablankenship@gmail.com.

55.     For example, on May 27, 2022, and June 6, 2022, Blankenship emailed to himself at his personal email address thousands of pages of notes from MMA servers, including large amounts of client contact information.

56.     From June 8, 2022 to June 13, 2022 (including *after* his immediate resignation), Blankenship forwarded to his personal email address at least 20 documents (including retirement plan and fund information) and communications relating to ongoing work for at least five MMA clients.

### Luketic's Emails to Her Personal Gmail Account

57.     During the weeks immediately preceding her voluntary resignation from MMA, Luketic sent large amounts of MMA data to her personal email account, lluketic1820@gmail.com.

58.     For example, on May 24, 2022, Luketic sent to her personal email address hundreds of pages of notes from MMA servers, including contact information spreadsheets with over 300 entries, many of which were for MMA clients.

59.     On May 25, 2022, Luketic forwarded to her personal email address at least 13 MMA documents, including templates and retirement plan documents for at least five specific MMA clients.

60.     From May 25, 2022 to June 1, 2022, Luketic also used MMA time and resources to set up meetings, trials, and demonstrations with potential vendors for Advo(k)ate Advisors, including Prezi, Knovio, SalesHood, Allego, Seismic, RetireUp, Vidyard, and iSpring Solutions.

### Misappropriation of MMA Website

61.     MMA owned a website for the JSL Securities business serviced by Defendants as employees of MMA, called "JSLRetirement.com."

62.     Defendants redirected the "JSLRetirement.com" to Advo(k)ate without any authorization from MMA, and renamed the website to "Advo(k)ate" in order to facilitate their solicitation and servicing of MMA clients on behalf of Advo(k)ate.

### Solicitation of Clients by Misrepresentation

63.     Immediately following their submission of notice to MMA of their voluntary resignations from employment with MMA, Defendants began soliciting MMA clients to work with them at Advo(k)ate.

64.     In soliciting MMA clients, Defendants sent a form email to some, most, or all of the MMA clients they serviced during their employment with MMA, with the misleading subject line "JSL Retirement Services Group Contact Information Change - Advo(k)ate Advisors Direct."

65.     In these form emails to MMA clients, Defendants falsely stated, "The JSL Retirement Services Group is re-branding, and will operate going forward under our new name, Advo(k)ate Advisors."

66.     In fact, there was no "re-branding."  Advo(k)ate is a new entity, owned by some or all of the Defendants.  Advo(k)ate is unaffiliated with MMA or JSL.

67.     Defendants' use of the JSL name in their solicitation emails was false and misleading.

68.     Defendants' use of the JSL name in their solicitation emails was without authorization by MMA.

69.     The JSL name and brand is owned by MMA.

**Solicitation of MMA Employees**

70.     On the same date that Defendants voluntarily resigned from employment with MMA, three other MMA employees with whom Defendants worked closely while employed by MMA (Derek Burrow, Victoria Ragland, and Angie Webster) also voluntarily and abruptly resigned their employment with MMA.

71.     Immediately after resigning from MMA, Burrow, Ragland, and Webster also became employed with Advo(k)ate.

72.     Upon information and belief, Defendants solicited and caused Burrow, Ragland, and Webster to leave employment with MMA in order to become employed by Advo(k)ate.

**MMA HAS BEEN HARMED BY DEFENDANTS' UNLAWFUL CONDUCT**

73.     To date, Defendants solicited away from MMA approximately 94 clients.

74.     To date, the clients solicited by Defendants away from MMA represent annual revenue of approximately $1,800,000.

75.     Upon information and belief, Defendants continue to breach their contractual obligations.

76.     Defendants, in concert with each other, disclosed to Advo(k)ate, and used for the benefit of Advo(k)ate, MMA's Confidential Information and Trade Secrets, for the purpose

of contacting, soliciting, and/or servicing MMA's clients.

77.     Such Confidential Information and Trade Secrets include but are not limited to: client names; client contact information; identities of client contacts responsible for entering into contracts with MMA; financial information pertaining to MMA's business with such clients; client needs and requirements; client service agreements; client check cutting fee information; client fee agreements and service plan information; client retirement plan documents; and, the manner in which MMA serviced client needs and requirements.

78.     Based on Defendants' conduct to date, it is believed that Defendants will continue to use, for their own benefit, Confidential Information and Trade Secrets belonging to Plaintiff.

79.     Upon information and belief, Defendants are currently in possession of MMA's Confidential Information and Trade Secrets information and are using such information without MMA's authorization.

80.     Based on Defendants' conduct to date, it is believed that Defendants, in concert with each other and Advo(k)ate, will continue to solicit and service MMA's clients and in violation of the NSAs.

81.     The covenants contained in the NSAs are reasonably necessary to protect MMA's legitimate business interests.

82.     Because MMA's client relationships and MMA's knowledge and expertise, which have been built and fostered over time at considerable expense to MMA, are essential to its success, Defendants must be enjoined from breaching the NSAs, and unfairly utilizing MMA's Confidential Information and Trade Secrets to compete with MMA.

83.     Only through the issuance of an injunction can Defendants be prevented

from continuing to irreparably harm and unlawfully compete with MMA to its detriment.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(Breach of Contract – Client Non-Solicitation Provisions)**

84.     MMA repeats and realleges each and every allegation contained in Paragraphs "1" through "83" of the Complaint, with the same force and effect as though set forth at length herein.

85.     The NSAs are valid and binding agreements between Defendants and MMA.

86.     MMA performed its obligations under the NSAs.

87.     Defendants, in concert with each other and Advo(k)ate, directly or indirectly solicited, diverted, taken away, or serviced MMA's clients and prospective clients with whom Defendants had contact or about whom they obtained Confidential Information and Trade Secrets during the last two (2) years of their employment with MMA.

88.     By virtue of their solicitation and servicing of MMA's clients on behalf of themselves and/or Advo(k)ate, Defendants violated the non-solicitation obligations set forth in their respective NSAs.

89.     As a direct and proximate result of the foregoing actions of Defendants, Plaintiff has suffered damages in an amount which is presently unascertainable, but is in excess of $3,600,000, plus interest, for which Defendants are jointly and severally liable.

90.     Pursuant to the NSAs, MMA also is entitled to recover from Defendants the costs and expenses incurred in this action, including attorneys' fees.

91.     Defendants, in concert with each other and with Advo(k)ate, are continuing to violate the covenants contained in the NSAs, and unless enjoined by this Court, will continue to do so.

92.     As a result of the foregoing actions of Defendants and their breaches of contract, MMA suffered and will continue to suffer damages that cannot be compensated monetarily.

93.     MMA has no adequate remedy at law to prevent these breaches of contract or injuries.

94.     Accordingly, MMA is entitled to an injunction prohibiting Defendants from violating the terms of their NSAs.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Breach of Contract – Breach of Confidentiality)**

95.     MMA repeats and realleges each and every allegation contained in Paragraphs "1" through "94" of the Complaint, with the same force and effect as though set forth herein at length.

96.     The NSAs are valid and binding agreements between Defendants and MMA.

97.     MMA performed its obligations under the NSAs.

98.     Defendants, in concert with each other and Advo(k)ate, took, used, divulged, and/or disclosed Confidential Information and Trade Secrets belonging to MMA for their own purposes and/or for Advo(k)ate's purposes.

99.     By their collaborative conduct, Defendants breached the confidentiality provisions in their respective NSAs.

100.     As a direct and proximate result of the foregoing actions of Defendants, MMA suffered damages in an amount which is presently unascertainable, but is in excess of $3,600,000, plus interest, for which Defendants are jointly and severally liable.

101.     Pursuant to the NSAs, MMA also is entitled to recover from Defendants the

costs and expenses incurred in this action, including attorneys' fees.

102.    Unless enjoined by this Court, Defendants will continue to violate the covenants contained in their respective NSAs with MMA.

103.    As a result of the foregoing actions of Defendants and their breaches of their NSAs, MMA suffered and will continue to suffer damages that cannot be compensated monetarily.

104.    MMA has no adequate remedy at law to prevent these breaches of contract or injuries.

105.    Accordingly, MMA is entitled to an injunction prohibiting Defendants from violating the terms of their NSAs.

### AS AND FOR A THIRD CAUSE OF ACTION
**(Breach of Contract – Solicitation of Employees)**

106.    MMA repeats and realleges each and every allegation contained in Paragraphs "1" through "105" of the Complaint, with the same force and effect as though set forth herein at length.

107.    The NSAs are valid and binding agreements between Defendants and MMA.

108.    MMA performed its obligations under the NSAs.

109.    Defendants solicited, induced, recruited, or made offers of employment to or assisted in the recruitment of or the making of an offer of employment by Advo(k)ate to MMA employees who were employed during the last 12 months of Defendants' employment with MMA, and with whom Defendants had direct or indirect involvement during their employment with MMA.

110.    By virtue of their solicitations of MMA's employees, Defendants violated the non-solicitation of employees obligations set forth in the NSAs.

111.    As a direct and proximate result of the foregoing actions of Defendants, MMA suffered damages in an amount which is presently unascertainable, but is in excess of $500,000, plus interest, for which Defendants are jointly and severally liable.

112.    Pursuant to the NSAs, MMA also is entitled to recover from Defendants the costs and expenses incurred in this action, including attorneys' fees.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Misappropriation of Confidential Information and Trade Secrets)

113.    MMA repeats and reallege each and every allegation contained in Paragraphs "1" through "112" of the Complaint, with the same force and effect as though set forth herein at length.

114.    By virtue of their employment, Defendants owed duties to MMA not to use, disclose or otherwise misappropriate MMA's Confidential Information and Trade Secrets.

115.    Under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§1831-1839, an owner of a trade secret that is misappropriated may bring a civil action if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.

116.    MMA is the owner of the Confidential Information and Trade Secrets described herein.

117.    The Confidential Information and Trade Secrets described herein are trade secrets because they are a form of financial, business, technical, or economic, information; MMA has taken reasonable measures to keep such information secret; and the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

118.    By virtue of their coordinated conduct, Defendants violated their duties not

to misappropriate MMA's Confidential Information and Trade Secrets.

119.    Defendants acquired MMA's Confidential Information and Trade Secrets through improper means, by emailing Confidential Information and Trade Secrets to their personal email accounts, and by removing boxes of such material over the weekend of June 11 and 12, 2022.

120.    By virtue of their employment by Advo(k)ate, and their possession of significant and vital confidential information regarding MMA, its clients, and employees, it is inevitable that Defendants will continue to use and disclose MMA's Confidential Information and Trade Secrets on behalf of themselves and Advo(k)ate.

121.    Defendants are continuing to use, disclose to others, and misappropriate MMA's Confidential Information and Trade Secrets.

122.    Defendants have acted in concert with intentional, malicious, and/or otherwise wanton disregard of MMA's rights.

123.    As a direct and proximate result of Defendants' misappropriation of MMA's Confidential Information and Trae Secrets, MMA suffered actual damages in an amount which is presently unascertainable, but is in excess of $3,600,000, plus interest, plus exemplary damages, for which Defendants are liable.

124.    Defendants have profited and will continue to profit from the aforesaid misappropriation of MMA's Confidential Information and Trade Secrets.

125.    Unless enjoined by this Court, Defendants' misappropriation of MMA's Confidential Information and Trade Secrets will continue and will cause MMA to suffer damages that cannot be compensated monetarily.

126.    MMA has no adequate remedy at law to prevent this harm.

127.     MMA is entitled to an injunction prohibiting Defendants from misappropriating MMA's Confidential Information and Trade Secrets.

### AS AND FOR A FIFTH CAUSE OF ACTION
**(Breach of Duty of Loyalty Against Individual Defendants)**

128.     MMA repeats and realleges each and every allegation contained in Paragraphs "1" through "127" of the Complaint, with the same force and effect as though set forth herein at length.

129.     By virtue of their roles as trusted employees, Defendants owed fiduciary duties to MMA, including but not limited to a duty of loyalty.

130.     Within the scope of Defendants' employment with MMA, MMA entrusted Defendants to interact with current and prospective clients solely for MMA's benefit.

131.     MMA also entrusted Defendants with Confidential Information and Trade Secrets for the sole purpose of enabling them to perform their job responsibilities.

132.     Defendants owed MMA a duty not to exploit their access to MMA's clients, prospective clients, business opportunities, goodwill, and Confidential Information and Trade Secrets to advance their own or Advo(k)ate's interests.

133.     Upon information and belief, while still employed by MMA, Defendants stopped working on business development opportunities to divert those opportunities to one another and to future employer Advo(k)ate.

134.     While employed by MMA, Defendants, on behalf of themselves and Advo(k)ate, contacted MMA's clients and prospective clients in order to attempt to secure their business at Advo(k)ate.

135.     While employed by MMA, Defendants failed to disclose business opportunities to MMA and instead kept such business opportunities for themselves and

Advo(k)ate.

136.     While still employed by MMA, Defendants, on behalf of themselves and Advo(k)ate, removed, copied, and/or retained MMA's Confidential Information and Trade Secrets, including but not limited to client-related documents, including the contacts for MMA's clients.

137.     While still employed by MMA, Defendants, in concert and on behalf of themselves and Advo(k)ate, solicited each other and other MMA employees to leave employment with MMA and/or to join Advo(k)ate.

138.     By their conduct, Defendants have violated their duties of loyalty to MMA.

139.     By their conduct, Defendants have damaged Plaintiffs' reputation and goodwill.

140.     MMA is entitled to recover from Defendants all monies paid to them during their period of disloyalty, as faithless servants.

141.     Defendants, in concert with each other, acted with intentional, malicious and/or wanton disregard of MMA's rights, and their conduct was so outrageous so as to warrant the imposition of punitive damages.

142.     As a direct and proximate result of Defendants' coordinated conduct, MMA suffered damages in an amount which is presently unascertainable, but is in excess of $3,600,000, plus interest, attorneys' fees and exemplary damages, for which Defendants are jointly and severally liable.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Unfair Competition Against All Defendants)

143.     MMA repeats and realleges each and every allegation contained in Paragraphs "1" through "142" of the Complaint, with the same force and effect as though set forth

herein at length.

144.    By virtue of the conduct as alleged herein, Defendants intentionally, knowingly, and maliciously competed unfairly with MMA, including but not limited to their conduct in: (a) using, disclosing and/or misappropriating MMA's Confidential Information and Trade Secrets; (b) misappropriating MMA's website for their own purposes; and (c) falsely stating to clients that their wholly new venture was merely a "re-branding."

145.    Defendants have acted with intentional, malicious, and/or wanton disregard of MMA's rights.

146.    As a direct and proximate result of Defendants' conduct, MMA suffered damages in an amount which is presently unascertainable, but is in excess of $3,600,000, plus interest, plus exemplary damages, for which Defendants are liable.

147.    Unless enjoined by this Court, Defendants will continue to engage in unfair competition against MMA and will cause MMA to suffer damages that cannot be compensated monetarily.

148.    MMA has no adequate remedy at law to prevent this harm.

149.    Accordingly, MMA is entitled to an injunction prohibiting Defendants from continuing to engage in unfair competition against them.

## **PRAYER FOR RELIEF**

**WHEREFORE**, MMA respectfully demands judgment in its favor and against Defendants as follows:

1(a).    Against Defendants on the First Cause of Action, for damages, losses and expenses in an amount which presently is unascertainable but is in excess of $3,600,000, plus interest, costs and expenses (including attorneys' fees), or for such other or further amount as the

Court deems just and proper;

1(b).   Against Defendants on the First Cause of Action, enjoining and restraining them from breaching the non-solicitation of clients covenants contained in their NSAs;

2(a).   Against Defendants on the Second Cause of Action, for damages, losses and expenses in an amount which presently is unascertainable but is in excess of $3,600,000, plus interest, costs and expenses (including attorneys' fees), or for such other or further amount as the Court deems just and proper;

2(b).   Against Defendants on the Second Cause of Action, enjoining and restraining them from breaching the confidentiality covenants contained in their NSAs;

3.   Against Defendants on the Third Cause of Action, for damages, losses and expenses in an amount which presently is unascertainable but is in excess of $500,000, plus interest, plus exemplary damages, or for such other or further amount as the Court deems just and proper;

4(a).   Against Defendants on the Fourth Cause of Action, for damages, losses and expenses in an amount which presently is unascertainable but is in excess of $3,600,000, plus interest, plus exemplary damages, or for such other or further amount as the Court deems just and proper;

4(b).   Against Defendants on the Fourth Cause of Action, enjoining and restraining them from misappropriating Plaintiffs' Confidential Information and Trade Secrets;

5.   Against Defendants on the Fifth Cause of Action, for damages, losses and expenses in an amount which presently is unascertainable but is in excess of $3,600,000, plus

interest, plus exemplary damages, or for such other or further amount as the Court deems just and proper;

6(a).    Against Defendants on the Sixth Cause of Action, for damages, losses and expenses in an amount which presently is unascertainable but is in excess of $3,600,000, plus interest, plus exemplary damages, or for such other or further amount as the Court deems just and proper;

6(b).    Against Defendants on the Sixth Cause of Action, enjoining and restraining Defendants from engaging in unfair competition against Plaintiffs; and

7.    Granting Plaintiff final judgment against Defendants for all allowable costs, attorneys' fees and other litigation expenses, and granting to Plaintiffs such other and further relief as the Court deems just and proper.

Dated:  New York, New York
         October 19, 2022

Respectfully submitted,

JACKSON LEWIS P.C.
666 Third Avenue, 29th Floor
New York, New York 10017
(212) 545-4000

By:    s/Clifford Atlas
       Clifford R. Atlas
       Cooper Binsky

ATTORNEYS FOR PLAINTIFF