UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
MARSH & MCLENNAN AGENCY LLC,                                      :
                                                                  :
                                    Plaintiff,                    :
                                                                  :          22 Civ. 8920 (JPC)
                    -v-                                           :
                                                                  :          OPINION AND ORDER
                                                                  :
DONALD DRENNAN WILLIAMS, JR., *et al.*,                           :
                                                                  :
                                    Defendants.                   :
                                                                  :
------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Plaintiff Marsh & McLennan Agency, LLC ("MMA") commenced this action against four former employees—Donald Drennan Williams, Jr., Phillip Andrew Blankenship, Charles Anderson, and Lindsey Luketic—for actions they took while still employed with MMA. MMA alleges, among other things, that Defendants established a competing company, solicited MMA's clients for that new company, misappropriated confidential information, and breached their contracts with MMA. Defendants move to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1), arguing that MMA lacks standing to pursue any of its claims against them. In the alternative, Defendants move to compel arbitration or to stay this action pending the outcome of a Financial Industry Regulatory Authority ("FINRA") arbitration that Williams and Blankenship commenced against two of MMA's subsidiaries and two employees of those subsidiaries. For the reasons set forth below, the Court denies Defendants' motion to dismiss, grants Defendants' motion to compel arbitration with respect to MMA's claims against Williams, Blankenship, and Anderson, and stays this case in its entirety pending that arbitration.

# I. Background

## A.    Facts[1]

In July 1982, Anderson and Williams's late father opened a branch office of Royal Alliance Associates, Inc. ("Royal Alliance")[2] to provide securities and investment advisory services. Williams Decl. ¶ 1.  Williams joined that Royal Alliance branch in 2004.  *Id.*  Anderson and Williams also were part owners of an insurance agency, Anderson, Williams & Company ("AW").  *Id.* ¶ 2.  While conducting insurance business under the AW name, Anderson and Williams "separately provided securities and investment advisory services as independent contractor Registered Representatives for Royal Alliance."  *Id.*  In 2007, J. Smith Lanier & Co. ("JSL"), an insurance brokerage firm, acquired AW through two separate asset purchase agreements—one with Anderson and Williams's father, and another with Williams.  *Id.* ¶ 3; Compl. ¶¶ 17, 19-20. Under the agreements, JSL acquired from Williams and Anderson, among other things, their

> right, title and interest to (i) all contracts related to the sale of insurance . . . , including all revenues from whatever sources generated by or on behalf of Seller as commissions, renewals or servicing fees under such contracts, (ii) all contracts related to the rendering of investment, consulting, money management, investment

---

[1] The following facts are taken from MMA's Complaint, Dkt. 1 ("Compl."); *see Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016), as well as other relevant documents which the parties have presented to the Court, including a declaration from Williams, Dkt. 29-1 ("Williams Decl."), and the transcripts of depositions of various witnesses, *see APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003) ("Where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings . . . ." (internal quotation marks and alterations omitted)).  The Court will refer to the deposition transcripts as follows: (1) Dkt. 70 ("Sansbury Decl."), Exh. A, and Dkt. 66 ("Atlas Decl."), Exh. A, collectively, as "Williams Dep. Tr."; (2) Atlas Decl., Exh. B, as "Blankenship Dep. Tr."; (3) Atlas Decl., Exh. C, as "Luketic Dep. Tr."; (4) Sansbury Decl., Exh. B, and Atlas Decl., Exh. E, collectively, as "Plan Dep. Tr."; and (5) Sansbury Decl., Exh. C, and Atlas Decl., Exh. D, collectively, as "Blackmore Dep. Tr."

[2] At the time, Royal Alliance was known as Integrated Resources Equity Corporation.  *See* Williams Decl. ¶ 1.  While the company is now known as Osaic Wealth, Inc., *see* Dkt. 59 at 2 n.1; *The History of Osaic*, https://osaic.com/about/history (last visited April 30, 2025), this Opinion and Order refers to the entity as "Royal Alliance," as that was the company's name at all relevant times during this dispute.

advisory, or employee benefit services, including all commissions, fees, retainers and similar sources of income under such contracts, . . . (iv) any contracts or agreements of any type or nature entered into after [March 1, 2007] . . . with any insurance carriers, broker dealers, registered investment companies, registered investment advisors or other entities, including contracts or agreements under which either Seller or Purchaser shall become entitled to commissions, fees, retainers and similar sources of income related to the rendering of investment, consulting, money management, investment advisory, or employee benefit services . . . .

Atlas Decl., Exh. I ("Bill of Sale") at 1; Compl. ¶¶ 19-20.

The agreement additionally provided that, if JSL was not entitled to hold or receive any commissions or fees stemming from the sale of securities products or investment advice, then JSL assigned the rights to that compensation to JSL Securities, Inc. ("JSL Securities"), "a wholly owned subsidiary of [JSL] licensed and registered . . . as a broker dealer." Bill of Sale at 1. JSL Securities was incorporated and registered as a broker-dealer specifically to receive revenue from the securities work conducted by Anderson and Williams. *See* Plan Dep. Tr. at 14:14-21, 17:5-8. But JSL Securities was a "limited" broker-dealer in the sense that "[its] customers were held at Royal Alliance and the other broker[-]dealers" for "compliance purposes." *Id.* at 32:11-36:6. In other words, JSL Securities "outsourc[ed its] compliance and operational servicing capacities" to Royal Alliance; Royal Alliance retained an average of five percent of the revenue, and JSL Securities received the other ninety-five percent. Blackmore Dep. Tr. at 26:12-18, 27:20-28:1.

The relationship between JSL Securities and Royal Alliance was governed by a Broker Dealer Services Agreement. Williams Decl. ¶ 6; *see also id.*, Exh. C ("Services Agreement"). Pursuant the Services Agreement, "registered representatives affiliated with both Royal Alliance and [JSL Securities] and/or [JSL] shall cause all communications with customers and potential customers with respect to securities products to be made solely in their capacity as a registered representative of Royal Alliance, and all customer relationships created as a result of such

communications shall be recorded on the books and records of and accounted for solely as a new account of Royal Alliance." Services Agreement at 1. To register as a registered representative and provide securities services for JSL Securities through Royal Alliance, Williams and Anderson filed Form U-4s,[3] dated February 20, 2007. Williams Decl. ¶¶ 4-5; Stansbury Decl., Exh. E ("Form U-4s") at 1-15 (Williams's Form U-4), 31-41 (Anderson's Form U-4). Included in each Form U-4 was an arbitration provision, through which Williams and Anderson "agree[d] to arbitrate any dispute, claim or controversy that may arise between [him] and [his] firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the [self-regulatory organizations]." Form U-4s at 13, 39 (emphases omitted).

Once JSL acquired AW, Williams and Anderson become W-2 employees of JSL, while remaining independent contractors for Royal Alliance. Williams Dep. Tr. at 10:10-15, 34:2-9; Plan Dep. Tr. at 21:15-22:5. Blankenship joined JSL in 2008, and Luketic joined JSL full time in 2011, each operating under the same revenue-sharing agreement between JSL Securities and Royal Alliance. Williams Decl. ¶ 9. Blankenship also filed a Form U-4 to register as a registered representative and provide securities services for JSL Securities, with his form dated September 6, 2012. Form U-4s at 16-30. Blankenship's Form U-4 contained an identical arbitration provision as the one in Williams's and Anderson's forms. *Id.* at 28.

In 2016, Williams learned that JSL was to be acquired by MMA—a firm that provides risk management and consulting, insurance brokerage, financial solutions, and employee benefits program management services, as well as delivers retirement and wealth management services to

---

[3] A Form U-4, titled Uniform Application for Securities Industry Registration or Transfer, is filed by "[r]epresentatives of broker-dealers, investment advisers or issuers of securities" to "register[] with the appropriate jurisdictions and/or self-regulatory organizations (SROs)." *Form U4*, https://www.finra.org/registration-exams-ce/broker-dealers/registration-forms/form-u4 (last visited April 30, 2025).

its clients by working through regulated broker dealer and investment advisor affiliates. Williams Decl. ¶ 14; Compl. ¶¶ 13-14. MMA did not intend to keep JSL Securities intact after the acquisition, instead planning to transfer clients from JSL Securities to an entity called MMA Securities, LLC ("MMA Securities")—the regulatory vehicle for MMA. Williams Decl. ¶¶ 13-14. Although MMA took some steps toward that end, the clients were never transitioned to MMA Securities. *Id.* ¶¶ 13, 16.

In exchange for the benefits inured from their employment with MMA, each Defendant signed a Non-Solicitation Agreement with JSL, its subsidiaries, and their respective parents and affiliates (the "Company"). Dkt. 34, Exhs. 1-4 ("Non-Solicitation Agreements"). The Non-Solicitation Agreements prohibited Defendants from, among other things, directly or indirectly: soliciting clients or prospective clients of the Company within two years of separation; inducing clients or prospective clients to not conduct business with the Company, also within two years of separation; and soliciting Company employees to terminate their employment with the Company during the last two years of Defendants' employment. *Id.* at 1-2. The Non-Solicitation Agreements also prohibited Defendants from disclosing confidential information or trade secrets, *id.* at 4-5, and required them to return any "originals and all copies of all files, notes, documents, . . . lists of the Company's clients . . . , and other media or property in [their] possession or control which contain or pertain to Confidential Information and Trade Secrets," *id.* at 5. Each Defendant was further required to return their "telephones and other equipment." *Id.* The Non-Solicitation Agreements included a "Governing Law and Choice of Forum" clause, designating New York law as the governing the contracts and selecting the New York state courts and this District as the exclusive fora for disputes "with respect to [the Non-Solicitation Agreements] and [Defendants'] employment." *Id.* at 8.

In April 2022, Williams and Anderson met with executives at MMA regarding MMA's plan to transition the securities business from JSL Securities to MMA Securities. Williams Dep. Tr. at 63:7-64:12. Immediately after that meeting, Williams and Anderson decided to resign from MMA, *id.*; Blankenship Dep. Tr. at 86:6-16, but they did not submit their resignation notices until June of that year, Williams Dep. Tr. at 95:22-25. Between April and June of 2022, Defendants began preparing for their resignation. During that time, for example, Defendants emailed, from their MMA email addresses to their personal email addresses, client contact information and documents. *Id.* at 79:7-19; Blankenship Dep. Tr. at 140:21-143:21. Also during that time—in May 2022 and while still employed at MMA—Williams and Blankenship formed a new company, Advo(k)ate Advisors, which provided investment advisory services to employer-sponsored retirement plans and individuals, as well as some securities brokerage business through Royal Alliance. Williams Dep. Tr. at 12:23-15:7. Defendants additionally solicited each other to terminate their employment with MMA and start working for Advo(k)ate. Compl. ¶ 39; Blankenship Dep. Tr. at 21:2-9, 59:8-60:9, 64:7-65:12, 114:19-125:5.

The weekend before Defendants' synchronized resignations, they removed property from MMA's office in Birmingham, Alabama. Williams and Anderson, along with several colleagues and family members, organized a "collective effort" to remove files from MMA's office on the Saturday before their resignations. Blankenship Dep. Tr. at 74:20-75:25. Defendants took around fifteen to twenty boxes of insurance and securities files regarding clients that Defendants had worked with. *Id.* at 66:16-68:25. Blankenship also forwarded client-related emails to himself from his MMA iPhone after his resignation and before he returned the company phone. *Id.* at 85:11-86:5. Finally, Defendants renamed the "JSLRetirement.com" website "Advo(k)ate."

Compl. ¶¶ 61-62.[4]  On the morning of June 13, 2022, Defendants coordinated their simultaneous resignations, down to the letter of the email, and informed clients via email that the JSL Retirement Services Group was "re-branding" as Advo(k)ate.  *Id.* ¶¶ 64-66; Blankenship Dep. Tr. at 64:14-24, 112:5-113:9, 144:2-145:3; Atlas Decl., Exh. H at 2-3 (June 13 email to clients).  Defendants also physically mailed a substantively similar "re-branding" message to other individual clients. Williams Dep. Tr. at 100:9-22.

Also on June 13, 2022, Royal Alliance notified MMA of its intention to terminate the Services Agreement, which it did sixty days later.  Williams Dep. Tr. at 158:22-159:17. Defendants all currently work for Advo(k)ate, along with, among others, former MMA employees Derek Burrow, Vickie Ragland, and Angie Webster, as well as Lisa Pettis, who was being recruited by MMA.  Blankenship Dep. Tr. at 21:2-9; Williams Dep. Tr. at 14:24-15:24; Luketic Dep. Tr. at 122:12-124:10.  Advo(k)ate's securities and investment advisory work is offered only through Royal Alliance with Blankenship and Williams as the registered representatives and investment advisors.  Blankenship Dep. Tr. at 30:24-31:10, 32:9-16; Williams Dep. Tr. at 14:7-9. Advo(k)ate's employees, however, "left behind the insurance work [they] performed through MMA."  Williams Decl. ¶ 17.

## B.  Procedural History

MMA filed this suit on October 19, 2022, bringing breach of contract and tort claims against Defendants.  Dkt. 1.  MMA alleges that Defendants breached the Non-Solicitation Agreements in three separate ways: by soliciting MMA clients in violation of the client non-solicitation provisions (First Cause of Action), Compl. ¶¶ 84-94, by taking and using confidential

---

[4] While MMA alleges that it owned the domain name, Compl. ¶ 61, Defendants argue that the website has always been registered to Williams, *see* Dkt. 69 ("Reply") at 7-8.  This factual dispute does not impact the Court's resolution of Defendants' motion.

information and trade secrets in violation of the confidentiality provisions (Second Cause of Action), *id.* ¶¶ 95-105, and by recruiting MMA employees in violation of the employee non-solicitation provisions (Third Cause of Action), *id.* ¶¶ 106-112.  As for the tort claims, MMA brings three more causes of action: misappropriation of confidential information and trade secrets (Fourth Cause of Action), *id.* ¶¶ 113-127, breach of the duty of loyalty (Fifth Cause of Action), *id.* ¶¶ 128-142, and unfair competition (Sixth Cause of Action), *id.* ¶¶ 143-149.

After MMA filed the instant action, Williams and Blankenship initiated a FINRA arbitration proceeding against JSL Securities and MMA Securities, as well as two executives from those entities.  *See* Williams Decl., Exh. H (FINRA Statement of Claim).  On January 20, 2023, Defendants moved to dismiss the Complaint in this action for lack of subject matter jurisdiction on standing grounds, or, in the alternative, to compel arbitration or to stay this action pending arbitration.  Dkts. 28, 29.  The Court denied the motion without prejudice and allowed the parties to engage in jurisdictional discovery.  Dkt. 39 at 2.  Upon the conclusion of jurisdictional discovery, Defendants filed their Second Motion to Dismiss for Lack of Jurisdiction on March 18, 2024.  Dkts. 58, 59 ("Motion").  MMA filed an opposition brief on April 17, 2024.  Dkt. 65 ("Opposition").  Two weeks later, on May 1, 2024, Defendants filed their reply.  Dkt. 69.[5]

Defendants make three arguments in their motion.  First, they argue that the Complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(1) for lack of standing, contending that MMA did not suffer a legally cognizable injury.  Motion at 6-16.  Second, they

---

[5] On December 30, 2024, the Court asked the parties for supplemental briefing on Defendants' standing arguments.  Dkt. 71.  Both parties filed their supplemental letter briefs on January 14, 2025.  *See* Dkt. 73 (MMA's first supplemental brief); Dkt. 74 ("Defts. 1st Supp. Br.").  The Court similarly requested supplemental briefing on Defendants' collateral estoppel argument on March 6, 2025, Dkt. 76, and the parties submitted their briefs on March 13, *see* Dkt. 78 ("MMA 2nd Supp. Br."); Dkt. 77 ("Defts. 2nd Supp. Br.").

argue that, should MMA have standing to pursue this action, MMA must arbitrate its claims pursuant to the arbitration clause in the Form U-4s signed by Anderson, Williams, and Blankenship. *Id.* at 16-22. Third and finally, Defendants argue that, in the alternative, MMA's claims should be stayed pending the FINRA arbitration that Williams and Blankenship initiated against JSL Securities, MMA Securities, and two employees of those entities, which was ongoing as of the time of Defendants' motion. *Id.* at 22-25.[6] The Court addresses each in turn.[7]

## II. Motion to Dismiss

The Court starts with Defendants' challenge to MMA's standing before turning, if appropriate, to whether the Court should compel arbitration or stay the case.

### A. Legal Standard

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). Challenges to a court's subject matter jurisdiction under Rule 12(b)(1) come in two forms: facial or factual. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016). Facial challenges are "based solely on the complaint and the attached exhibits," and the party opposing the challenge "bears no evidentiary burden." *SM Kids, LLC v.*

---

[6] That arbitration apparently has concluded as, on January 7, 2025, Williams and Blankenship commenced a separate civil action in this District seeking to confirm the arbitration award. *See Williams v. JSL Sec. Inc.*, No. 25 Civ. 124 (JPC) (S.D.N.Y.).

[7] MMA additionally briefly argues that Defendants' failure to file a declaration or supporting affidavits as required by Local Civil Rule 7.1(a)(3) is reason enough to deny Defendants' motion. Opposition at 9, 22. The Court excuses any procedural defect in Defendants' motion because Defendants promptly corrected their violation, Defendants' moving brief and attached exhibits (which were timely filed) adequately apprised MMA of the motion's legal and factual grounds, and because "it would serve the interests of justice to resolve the motion on the merits rather than on procedural deficiencies." *Anhui Konka Green Lighting Co., LTD. v. Green Logic LED Elec. Supply, Inc.*, No. 18 Civ 12255 (MKV) (KHP), 2021 WL 621205, at *1 (S.D.N.Y. Feb. 17, 2021) (alteration adopted and internal quotation marks omitted).

*Google LLC*, 963 F.3d 206, 210 (2d Cir. 2020). By contrast, fact-based challenges, like the one made here, permit the movant to "proffer[] evidence beyond the [complaint and its exhibits]." *Carter*, 822 F.3d at 57; *see Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (explaining that "where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits" (alteration adopted and citation omitted)). "In opposition to such a motion, the plaintiff will need to come forward with evidence controverting that presented by the defendant if the defendant's evidence reveals the existence of factual problems regarding standing." *Lugo v. City of Troy*, 114 F.4th 80, 87 (2d Cir. 2024) (alteration adopted and internal quotation marks omitted).

**B.    Discussion**

Article III of the Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting U.S. Const. art. III, § 2). "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing." *Id.* (internal quotation marks omitted). To satisfy the "irreducible constitutional minimum of standing," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (internal quotation marks omitted), "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief," *TransUnion*, 594 U.S. at 423 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Moreover, "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *Id.* at 431.

Defendants make several arguments as to why MMA lacks standing, all of which center around MMA's lack of a cognizable injury. Defendants argue that: (1) MMA never had any securities clients, let alone received revenue from any such clients, so Defendants' solicitation of those clients could not have injured MMA, Motion at 7-11; (2) MMA suffered no injury from any misappropriation of confidential information or trade secrets related to securities clients because MMA did not have any securities clients or access to information related to those clients and Defendants did not retain any information related to insurance clients, *id.* at 11-13; (3) MMA has not been injured by Defendants' solicitation of employees because the restrictive covenants in the Non-Solicitation Agreements are unenforceable, *id.* at 13-14; (4) MMA has not been injured by any breach of Defendants' duty of loyalty because "there is no evidence that Defendants solicited or took information related to MMA insurance clients or diverted insurance business opportunities from MMA," and because Defendants "could not have diverted securities work from MMA because MMA cannot engage in such work," *id.* at 14; (5) MMA has not been injured by any unfair competition because Defendants do not compete with MMA, *id.* at 15; and (6) MMA cannot circumvent its lack of standing by seeking to recover injuries of its securities affiliates, *id.* at 15-16.

As discussed below, Defendants largely mischaracterize their arguments as going to MMA's standing to sue. With respect to MMA's breach-of-contract claims, Defendants' core argument is that, even if Defendants breached the Non-Solicitation Agreements, MMA suffered no injury from the breaches and thus it has no standing to pursue its claims. And with respect to MMA's tort claims, Defendants essentially argue that, because they did not commit the torts in question, MMA lacks standing to pursue its claims. Both sets of arguments go to the merits of MMA's claims, however, not its standing to bring this lawsuit.

1.    **MMA's Breach-of-Contract Claims**

With respect to the First, Second, and Third Causes of Action—the breach-of-contract claims—Defendants argue that MMA could not have suffered an injury sufficient to support its standing to sue.  "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560).  In these three causes of action, MMA alleges that it entered into the Non-Solicitation Agreements with Defendants, and that Defendants breached the terms of those contracts.

In moving to dismiss the breach-of-contract claims, Defendants operate on the assumption that a breach of contract, standing alone, is an insufficient injury for Article III purposes.  For example, Defendants argue that MMA has not suffered an injury from any alleged breach of the Non-Solicitation Agreements because MMA was not entitled to receive revenue from its securities clients.  Motion at 10-11.  Because MMA could not receive revenue from those clients, the logic goes, it could not have suffered an injury-in-fact as a result of any solicitation.  The fundamental flaw with this argument, however, is that a breach of a contract itself triggers an injury-in-fact for standing purposes, as it amounts to an invasion of the other party's legally protected interest that is actual, concrete, and particularized.

The parties to a contract enjoy certain rights and benefits as a result of their agreement, and those rights and benefits are legally protected interests.  *See Fleisher v. Phoenix Life Ins. Co.*, No. 11 Civ. 8405 (CM), 2013 WL 12224042, at *7 (S.D.N.Y. July 12, 2013) ("Invading a legally protected interest by breaching the terms of a contract is an injury-in-fact for purposes of standing." (citing *Lujan*, 504 U.S. at 560)).  The invasion of a contractual interest constitutes a concrete injury for the purposes of standing, even if that injury is not accompanied by a pecuniary loss.  *Eletson Holdings, Inc. v. Levona Holdings Ltd.*, No. 23 Civ. 7331 (LJL), 731 F. Supp. 3d 531, 569

(S.D.N.Y. 2024) ("A party to a contract need not have suffered direct financial loss to have a stake in its enforcement or to have suffered a concrete injury when it is breached."). In other words, "the failure to perform is *itself* an injury-in-fact, regardless of any economic loss." *In re AXA Equitable Life Ins. Co. COI Litig.*, No. 16 Civ. 740 (JMF), 2022 WL 3018104, at *3 (S.D.N.Y. July 29, 2022) (internal quotation marks omitted). Although the Second Circuit has yet to address the issue, several courts have followed this approach, holding that a bare breach of contract—one without an attendant monetary injury—is sufficient to confer Article III standing upon the party asserting the breach. *See, e.g.*, *Denning v. Bond Pharmacy, Inc.*, 50 F.4th 445, 451 (5th Cir. 2022); *Amrhein v. eClinical Works, LLC*, 954 F.3d 328, 331 (1st Cir. 2020); *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 909 (8th Cir. 2016); *Eletson Holdings*, 731 F. Supp. 3d at 569; *In re AXA Equitable Life Ins. Co. COI Litig.*, 2022 WL 3018104, at *3; *Culwick v. Wood*, 384 F. Supp. 3d 328, 337-39 (E.D.N.Y. 2019); *Attias v. CareFirst, Inc.*, 346 F.R.D. 1, 11 (D.D.C. 2024); *see also Springer v. Cleveland Clinic Emp. Health Plan Total Care*, 900 F.3d 284, 292 (6th Cir. 2018) (Thapar, J., concurring); *Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 161 (3d Cir. 2022) (Phipps, J., concurring); *Perry v. Newsom*, 18 F.4th 622, 639 (9th Cir. 2021) (Ikuta, J., dissenting). *But see Dinerstein v. Google, LLC*, 73 F.4th 502, 518-22 (7th Cir. 2023). Such a conclusion is consistent with the long tradition of federal courts entertaining suits for nominal damages resulting from breaches of contract, and it flows from the nature of contractual rights more generally.

In two recent cases, the Supreme Court explained that a "plaintiff's injury in fact [must] be 'concrete'—that is, 'real, and not abstract.'" *TransUnion*, 594 U.S. at 424 (quoting *Spokeo*, 578 U.S. at 340). But "'[c]oncrete' is not . . . necessarily synonymous with 'tangible.'" *Spokeo*, 578 U.S. at 340. In fact, the Supreme Court "ha[s] confirmed in many of [its] previous cases that intangible injuries can nevertheless be concrete." *Id.* "Chief among [such concrete intangible

injuries] are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion*, 594 U.S. at 425.  Key to this inquiry is "whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *Id.* at 424.

A breach of contract has long been recognized as providing a basis for suit in American courts.  *See Eletson Holdings*, 731 F. Supp. 3d at 571 ("For two centuries, courts have recognized that a party who suffers only nominal damages from a material breach may still seek relief in court against the breaching party." (citing *Marzetti v. Williams*, 109 Eng. Rep. 842, 846 (K.B. 1830)); *see also Wilcox v. Ex'rs of Plummer*, 29 U.S. (4 Pet.) 172, 181-82 (1830) (holding that breach of "a contract to act diligently and skilfully" provides a "ground[] of action" in federal court); Harold J. Berman & Charles J. Reid, Jr., *The Transformation of English Legal Science: From Hale to Blackstone*, 45 Emory L.J. 437, 460-61 (1996) (explaining that "the common-law courts in the late seventeenth and early eighteenth centuries expanded the forms of action to cover . . . obligations arising from breach of contract").  Indeed, "[c]ommon law courts heard breach of contract claims and awarded nominal damages even when 'there was no apparent continuing or threatened injury.'"  *Perry*, 18 F.4th at 639 (Ikuta, J., dissenting) (quoting *Uzuegbunam v. Preczewski*, 592 U.S. 279, 286 (2021)); *see also McCoy Assocs., Inc. v. Nulux, Inc.*, 218 F. Supp. 2d 286, 294 (E.D.N.Y. 2002) ("New York courts have long held that uncertainty in the amount of loss caused by a breach of contract, or even the complete absence of damages resulting from the breach, does not defeat a breach of contract claim." (footnote omitted)).  This history of courts awarding

nominal damages for breach of contract shows that the injury is inherent in the breach itself, and does not require some additional related harm.[8]

This longstanding tradition alone is enough to support the conclusion that an invasion of a contractually protected right is a concrete injury under Article III. Yet this conclusion also readily

---

[8] In a one-sentence footnote in their motion, Defendants argue that "[t]o the extent MMA argues . . . that it has been harmed by the mere alleged breach of the [Non-Solicitation Agreements] regardless of actual injury to MMA, MMA lacks standing because MMA has failed to claim such nominal damages in its complaint." Motion at 11 n.4 (citing *Fox v. Bd. of Trustees of State Univ. of N.Y.*, 42 F.3d 135, 142 (2d Cir. 1994)). But "[a] complaint need not include a prayer for nominal damages to preserve such a claim." *OL USA LLC v. Maersk A/S*, 730 F. Supp. 3d 66, 72 n.5 (S.D.N.Y. 2024). Nor did *Fox* establish otherwise. There, the Second Circuit declined to read a request for nominal damages (*i.e.*, retrospective relief) into a complaint that sought only declarative and injunctive relief (*i.e.*, prospective relief). *Fox*, 42 F.3d at 137-38, 141-42. On the other hand, where a "complaint explicitly [seeks] compensatory damages," like here, courts do "not preclude[] the award of nominal damages." *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 651 (2d Cir. 1998). A party that fails to adduce proof of compensatory damages, therefore, is still entitled to nominal damages if they otherwise prevail on their cause of action. *See Uzuegbunam*, 592 U.S. at 290 (explaining that nominal damages are "awarded by default until the plaintiff establishes entitlement to some other form of damages, such as compensatory or statutory damages").

Upon request by the Court, Defendants elaborated on this argument in their first supplemental letter brief. *See* Defts. 1st Supp. Br. at 5-7. Defendants urge the Court to, in its discretion, preclude MMA from recovering nominal damages because (1) MMA waived any argument for nominal damages by not making such argument in its opposition brief and (2) MMA does not seek actual damages to itself. *Id.* at 5-7. These arguments are unpersuasive. MMA's argument that it may recover nominal damages is not waived because it is within the scope of the supplemental briefing ordered by the Court. In fact, it is questionable whether Defendants themselves properly raised any argument about the unavailability of nominal damages by only mentioning the argument in a footnote, prompting the Court to invite further articulation of the point. *See Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45 (S.D.N.Y. 2016) ("Arguments made only in a footnote are generally deemed to be [forfeited]."). With respect to the second point, MMA alleges that it "suffered damages" as "a direct and proximate result of" Defendants' actions. Compl. ¶ 89; *see Luitpold Pharms., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie*, 784 F.3d 78, 87 (2d Cir. 2015) (reversing a district court's dismissal of breach-of-contract claim for failure to plead damages because the plaintiff "would have plausible claims for nominal damages," which "'are always available in breach of contract actions'" (quoting *Ely-Cruikshank Co. v. Bank of Montreal,* 615 N.E.2d 985 (N.Y. 1993))). As such, at this motion to dismiss stage, the Court declines to rule that MMA is precluded from recovering nominal damages should it fail to ultimately prove other damages. *Cf.* Fed. R. Civ. P. 54(c) (final judgments shall "grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings").

flows from general principles of contract law.  A valid contract entails obligations rooted in mutual assent and the exchange of consideration.  A party to a contract agrees to give up a legal benefit—consideration—in exchange for the right to control the other party's behavior in some way.  *See Nassau Cnty. v. N.Y. State Urb. Dev. Corp.*, 70 N.Y.S.3d 246, 248 (2d Dep't 2018) ("Consideration consists of either a benefit to the promisor or a detriment to the promisee.  It is enough that something is promised, done, forborne, or suffered by the party to whom the promise is made as consideration for the promise made to him or her." (alteration adopted; internal quotation marks omitted)); Restatement (Second) of Contracts § 17 ("[T]he formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration."); *id.* § 71 ("(1) To constitute consideration, a performance or a return promise must be bargained for. . . .  (3) The performance may consist of (a) an act other than a promise, or (b) a forbearance, or (c) the creation, modification, or destruction of a legal relation.").  In other words, a contract is formed through mutual assent and the exchange of consideration, securing not only legal rights but also a personal stake in the agreed-upon obligations.  When a contract is breached, the negotiated exchange of consideration is disrupted, and the promisee loses the benefit of the bargain.  A breach of contract, whether accompanied by actual damages or not, is therefore not an abstract harm but a direct infringement on a right the promisee deliberately secured through negotiation and consent.  Because contract rights arise from the parties' own commitments, their breach necessarily impacts a particularized interest, granting the promisee an inherently personal stake in the outcome of a subsequent claim for breach.  Thus, even if tangible harm does not flow from a breach of contract, the breach itself is a concrete and particularized injury that supports constitutional standing.

This conclusion also is in harmony with Second Circuit breach-of-contract case law. "Whether the elements of breach of contract . . . are satisfied, th[e Supreme] Court has said, goes to the merits, not to a court's power to resolve the controversy." *SM Kids*, 963 F.3d at 212. To recover for breach of contract under New York law, "a plaintiff must prove, by a preponderance of the evidence, (1) the existence of a contract between [the plaintiff] and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) *damages to the plaintiff* caused by that defendant's breach." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011) (emphasis added). Whether MMA suffered damages due to Defendants' breach—the fourth element of a breach-of-contract claim—therefore "goes to the merits" of their cause of action and not to the Court's "power to resolve the controversy." *SM Kids*, 963 F.3d at 212.

Defendants make separate challenges to MMA's standing to bring each of its three breach-of-contract causes of action. Unpacking each argument, however, reveals that these "argument[s], properly construed, [are] not that Plaintiff lacks standing, but that Plaintiff fails to state a claim," *Bensinger v. Denbury Res. Inc.*, 561 F. App'x 24, 25 (2d Cir. 2014) (summary order), because Defendants essentially merge the requirements for standing with the elements of breach of contract.[9] The Second Circuit has warned of this very move, cautioning "against arguments that would essentially collapse the standing inquiry into the merits, and [against] attempts to conflate the threshold question of the plaintiff's standing under Article III with the question of whether he has a valid claim on the merits." *SM Kids*, 963 F.3d at 212 (alterations adopted; internal quotation marks and citation omitted). Because "[f]ailing to state a claim . . . is not the same as being without

---

[9] Defendants in fact "concede that arguments about MMA's ability to establish a breach of contract go to the merits of MMA's claims rather than MMA's standing to sue." Defs. 1st Supp. Br. at 2 n.2.

standing to bring the claim," *Bensinger*, 561 F. App'x at 25, MMA has standing to pursue its breach-of-contract claims.

In the First Cause of Action, MMA alleges that Defendants have "directly or indirectly solicited, diverted, taken away, or serviced MMA's clients and prospective clients" in "violat[ion of] the non-solicitation obligations set forth in their respective [Non-Solicitation Agreements]." Compl. ¶¶ 87-88. As previewed above, Defendants claim that MMA lacks standing to pursue this claim because "MMA did not have securities customers or receive revenue from Defendants' securities work for Royal Alliance customers." Motion at 7. Defendants reason that "because MMA is not a FINRA-registered broker-dealer or an SEC-registered investment advisor," the "securities clients Defendants served could not have been clients of MMA as a matter of law" and "MMA legally could not and in fact never did receive any of the revenue from the . . . securities clients." *Id.* at 7-11 & n.3 (citing 15 U.S.C. § 78o). And moreover, the securities clients did not belong to JSL Securities, either; instead, Defendants argue, the clients belonged to Royal Alliance. *Id.* at 8-9.

This argument breaks down to two parts: MMA lacks standing because (a) any solicitation of securities clients did not cost MMA any revenue and (b) any client that Defendants solicited did not belong to MMA. Neither argument calls into question MMA's standing. First, the alleged lack of an attendant financial harm to MMA from Defendants' alleged breaches of the Non-Solicitation Agreements does not strip MMA of standing to bring a breach-of-contract claim. As explained above, as a party to the Non-Solicitation Agreements, MMA has a direct interest in their enforcement, and the alleged breaches of the Non-Solicitation Agreements caused a concrete injury to MMA. MMA's ability to prove direct financial harm from the breach goes to the merits of its claim, not to its standing to bring that claim. Second, whether the Royal Alliance customers

were "clients" of JSL Securities or MMA, for the purposes of the Non-Solicitation Agreements, is a matter of contract interpretation—not an issue of standing. Defendants argue that the solicited clients belonged to Royal Alliance, and so they did not violate the Non-Solicitation Agreements by soliciting them. MMA responds that those clients belonged to itself or one of its affiliates, and so Defendants violated the Non-Solicitation Agreements when they solicited them. This dispute goes to the merits of whether Defendants breached the Non-Solicitation Agreements and does not implicate the Court's adjudicatory power.

MMA's Second Cause of Action alleges that Defendants "took, used, divulged, and/or disclosed Confidential Information and Trade Secrets belonging to MMA" and thereby "breached the confidentiality provisions in their respective [Non-Solicitation Agreements]." Compl. ¶¶ 98-99. In challenging MMA's standing to bring this claim, Defendants again focus on MMA's alleged lack of securities clients. *See* Motion at 11-13. They argue that "[t]he securities client information Defendants retained could not belong to MMA because MMA does not have securities clients" and that "there is no evidence that Defendants took or used confidential information related to MMA insurance customers." *Id.* at 11-13. Initially, it unclear that the latter part of this argument is supported in the record, as Blankenship testified at his deposition that he removed from the office "primarily old term-insurance, individual insurance-type files." Blankenship Dep. Tr. at 66:22-25.[10] Regardless, Defendants' attack on the Second Cause of Action boils down to an argument that they did not violate the Non-Solicitation Agreements—*i.e.*, that because Defendants

---

[10] Defendants appear to acknowledge that they "retained some archival files related to individual insurance policies," Motion at 11 n.6, but they argue that MMA has not suffered any injury as a result because "MMA has stated that it 'is unaware of having lost [insurance] business to Defendants,'" *id.* (quoting Sansbury Decl., Exh. J at 1 (MMA's discovery responses)). But again, MMA's ability to prove direct financial harm from any breach of the Non-Solicitation Agreements goes to the merits of a breach-of-contract claim, not to the threshold inquiry of standing.

did not take confidential information that belongs to MMA, they did not breach the contracts, and thus MMA did not suffer an injury as a result. This dispute goes to the merits of MMA's claim and not to its standing to bring the claim.

Finally, MMA's Third Cause of Action for breach of contract alleges that "Defendants solicited, induced, recruited, or made offers of employment to or assisted in the recruitment of or the making of an offer of employment by Advo(k)ate to MMA employees," and that doing so "violated the non-solicitation of employees obligations set forth in the [Non-Solicitation Agreements]." Compl. ¶¶ 109-110. Defendants argue that MMA lacks standing to bring this cause of action because the restrictive covenant is not enforceable, and so MMA has not suffered an injury. Motion at 13-14. The enforceability of a contract goes to the merits of the parties' dispute, however; it is not a threshold question of the Court's jurisdiction. *Cf. SM Kids*, 963 F.3d at 212 (explaining that questions of "the existence of a contract . . . go[] to the merits, not to a court's power to resolve the controversy").

The standing and merits inquiries are independent of one another for good reason—unifying the two threatens to transform every deficiency in a plaintiff's case, such as whether he has stated a claim for relief, into a question of the court's "statutory or constitutional *power* to adjudicate the case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998).[11] Taking

---

[11] What is more, collapsing the two inquiries would neuter courts of their constitutional grant of adjudicatory power. Take one example: suppose that, at the end of a protracted trial, a jury finds that a plaintiff's damages from the defendant's breach of contract were zero. Under Defendants' theory, such a finding of fact would immediately divest the plaintiff of his standing to sue, for he has suffered no economic injury, and thereby would retroactively strip the court of its authority to decide the dispute. The court would no longer be able to enter a binding judgment in favor of one party or another; rather, it would be required to dismiss the case without prejudice for lack of subject matter jurisdiction. *See Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 445 (2d Cir. 2022) (explaining that a dismissal for "lack of standing [is], . . . by definition, without prejudice"); *cf. SM Kids*, 963 F.3d at 212 n.2 ("Treating contract formation as jurisdictional would

Defendants' arguments to their logical extension, courts would need to decide merits questions at the very outset of the case, for "[t]he requirement that jurisdiction be established as a threshold matter . . . is 'inflexible and without exception.'" *Id.* at 94-95 (quoting *Mansfield, C. & L.M.R. Co. v. Swan,* 111 U.S. 379, 382 (1884)).

As Defendants' arguments ultimately go to the merits of MMA's breach-of-contract causes of action, they are misplaced in a motion to dismiss for lack of jurisdiction. "A contest between a plausibly alleged claim and a defense exists in many, if not most, breach-of-contract lawsuits," and such a contest does not affect the court's jurisdiction. *SM Kids*, 963 F.3d at 211. Defendants thus have failed to show "the existence of factual problems regarding [MMA's] standing" to bring its three causes of action for breach of contract. *Lugo*, 114 F.4th at 87 (internal quotation marks omitted). The motion to dismiss is accordingly denied with respect to MMA's First, Second, and Third Causes of Action.[12]

### 2.    MMA's Tort Claims

Defendants make similar challenges to MMA's standing to bring tort claims against them. The Complaint pleads three causes of action in tort: (1) misappropriation of confidential information and trade secrets, Compl. ¶¶ 113-127; (2) breach of the duty of loyalty, *id.* ¶¶ 128-142; and (3) unfair competition, *id.* ¶¶ 143-149. The Court addresses Defendants' challenges to each cause of action in turn.

---

therefore call into question a federal court's ability to issue a claim-preclusive judgment that a contract did not exist.").

[12] In their first supplemental brief, Defendants argue that MMA's injuries are not redressable. *See* Defts. 1st Supp. Br. at 4-5. But as described above, courts have long recognized nominal damages as an appropriate form of redress in breach-of-contract cases where the plaintiff fails to ultimately prove actual damages. And MMA adequately has preserved a request for nominal damages here. The Court therefore rejects Defendants' redressability argument.

Defendants' argument with respect to MMA's misappropriation claim mirrors their challenge to MMA's claim of breaches of the Non-Solicitation Agreements' confidentiality provisions. *See* Motion at 11-13. Defendants argue that MMA did not own any confidential securities information that could have been misappropriated, and thus MMA could not have lost any business as a result of Defendants taking insurance information. *Id.* For that reason, they say, MMA has not suffered an injury-in-fact and therefore lacks standing to sue in tort. *Id.* Whether Defendants in fact misappropriated confidential information goes to the merits of MMA's claim, not to its standing. Therefore, the question here is whether MMA has sufficiently alleged injury from the alleged misappropriation to give rise to Article III standing.

The harm of misappropriation of confidential information is itself a concrete intangible harm for the purposes of Article III. As discussed, the Supreme Court in *TransUnion* explained that intangible harms are concrete injuries under Article III when they bear "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," such as, "for example, reputational harms, disclosure of private information, and intrusion upon seclusion." 594 U.S. at 425; *see also* Erwin Chemerinsky, *Federal Jurisdiction* 74 (8th ed. 2020) ("Injury to rights recognized at common law—property, contracts, and torts—are sufficient for standing purposes."). The common law protecting trade secrets is no less storied than the common law protecting privacy. *See* Elizabeth A. Rowe & Sharon K. Sandeen, *Trade Secret Law: Cases and Materials* 16 (2d ed. 2017) ("From the early 1800s through 1988, trade secret law in the United States was primarily governed by common law rather than statute."); Restatement (Second) of Torts § 652A & cmt. a ("Prior to 1890 no English or American court had ever expressly recognized the existence of the right [to privacy] . . . ."). The disclosure of confidential information is thus a harm "traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion*,

594 U.S. at 425.  Accordingly, by alleging the intangible harm of misappropriation of confidential information, MMA has alleged an injury sufficient to support its standing to bring the Fourth Cause of Action.

With respect to MMA's standing to pursue its Fifth Cause of Action, Defendants argue that "[t]here can . . . be no breach of a duty of loyalty to MMA premised on actions related to securities clients and securities business" because "there is no evidence that Defendants solicited or took information related to MMA insurance clients or diverted business opportunities from MMA." Motion at 14.[13]  In other words, Defendants argue that there is no evidence that Defendants committed the alleged tort, and so MMA lacks standing to bring this claim "for lack of injury." *Id.*  Whether Defendants committed the alleged tort is not a threshold jurisdictional question of MMA's standing, but goes to the merits.  If it were otherwise, no court would be able to issue a ruling, with preclusive effect, that a defendant did not commit a tort.  *See supra* n.11.

Finally, Defendants argue that MMA lacks standing to sue for alleged unfair competition "because Defendants do not compete with MMA."  Motion at 15.  Once again, Defendants' argument equates the merits of this cause of action with MMA's constitutional standing to sue. Because the Court does not resolve the merits of the dispute as a prerequisite to exercising its jurisdiction, Defendants' motion to dismiss is denied with respect to the Sixth Cause of Action as well.

* * *

Accordingly, Defendants' motion to dismiss for lack of standing is denied in its entirety.

---

[13] Defendants also argue that any duty of loyalty owed by them to MMA "would be preempted by the federal fiduciary duty Defendants, as investment advisers, owed to their client under the Investment Advisers Act."  Motion at 14 n.7.  But federal preemption is an affirmative defense that does not affect a plaintiff's standing.  *See Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 70-75 (2d Cir. 2019) (treating issues of standing and preemption separately).

### III.  Motion to Compel Arbitration

Defendants argue in the alternative that MMA should be compelled to arbitrate its claims against them under a theory of collateral estoppel "because MMA has already fully litigated and lost the identical question of whether MMA must arbitrate claims against a former employee based on securities clients and information pursuant to the arbitration clause in the Form U-4 between the employee and the MMA securities affiliate."  Motion at 17.[14]  Defendants point to the litigation in *Marsh & McLennan Agency LLC v. Ferguson*, No. 19 Civ. 3837 (VSB) (S.D.N.Y.), and in particular the Honorable Vernon S. Broderick's decision of July 2, 2021, compelling arbitration, *id.*, Dkt. 110 ("*Ferguson* Opinion"), as precluding MMA from relitigating whether it should be compelled to arbitrate its claims here.[15]

"Under non-mutual collateral estoppel, if a litigant has had an opportunity to fully and fairly litigate an issue and lost, then third parties unrelated to the original action can bar the litigant from relitigating that same issue in a subsequent suit."  *Austin v. Downs, Rachlin & Martin*, 114 F. App'x 21, 22 (2d Cir. 2004) (summary order).  Pursuant to New York law,[16] "[c]ollateral

---

[14] Defendants also argue that MMA is precluded from bringing this action in court, rather than in arbitration, based on a theory of equitable estoppel.  Motion at 19-22.  Because the Court compels arbitration under a collateral estoppel theory, it does not reach Defendants' equitable estoppel arguments.

[15] Judge Broderick's Opinion in *Ferguson* was sealed when Defendants first filed their motion, but was unsealed while the motion was pending.  *See Ferguson*, No. 19 Civ. 3837, Dkt. 144.  The Court accordingly ordered supplemental briefing on the collateral estoppel issue.  *See* Dkt. 76.

[16] "[T]he question of whose law governs the preclusive effect of a prior federal judgment turns on the basis for jurisdiction in that prior case, without regard to the basis for jurisdiction in a later case applying it."  *Stinnett v. Delta Air Lines, Inc.*, 803 F. App'x 505, 508 n.3 (2d Cir. 2020) (summary order).  Therefore, "as the Supreme Court has instructed, federal diversity judgments should be accorded the same preclusive effect that would be applied by state courts in the state in which the federal diversity court sits."  *Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 988 F.3d 634, 642 (2d Cir. 2021) (citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 507-08 (2001)).  Here, because the rendering court sat in diversity jurisdiction and applied the law

estoppel bars the relitigation of an issue of fact or law actually litigated and resolved in a valid

court determination essential to the prior judgment[,] and so the determination of an essential issue

is binding in a subsequent action, even if it recurs in the context of a different claim." *Russell v.*

*N.Y. Univ.*, 246 N.E.3d 868, 873 (N.Y. 2024) (internal quotation marks omitted). "If there is

identity of issues between the prior determination and the instant litigation, and the precluded party

had a full and fair opportunity to contest the prior determination, collateral estoppel applies and

the prior determination is binding in the subsequent action." *Id.*; *accord Weir v. Montefiore Med.*

*Ctr.*, No. 24-1527, 2025 WL 289497, at *3 (2d Cir. Jan. 24, 2025) (summary order) ("Under both

federal common law and New York law, issue preclusion bars parties from relitigating an issue of

fact or law when (1) the identical issue was raised in a previous proceeding; (2) the issue was

actually litigated and decided in the previous proceeding; (3) the party raising the issue had a full

and fair opportunity to litigate the issue in the prior proceeding; and (4) the resolution of the issue

was necessary to support a valid and final judgment on the merits." (internal quotation marks

omitted)); *see also Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) ("[T]here

is no discernible difference between federal and New York law concerning . . . collateral

estoppel."). "The doctrine, however, is a flexible one, and the enumeration of these elements is

intended merely as a framework, not a substitute, for case-by-case analysis of the facts and

realities." *Buechel v. Bain*, 766 N.E.2d 914, 919 (N.Y. 2001). "The party seeking the benefit of

collateral estoppel has the burden of demonstrating the identity of the issues, whereas the party

attempting to defeat its application has the burden of establishing the absence of a full and fair

opportunity to litigate the issue in the prior action." *Bruno v. Bank of New York*, 101 N.Y.S.3d

---

of New York, *see Ferguson*, No. 19 Civ. 3837, Dkt. 1 ¶ 22 (pleading diversity jurisdiction);
*Ferguson* Opinion at 28 (applying New York law), New York law governs the preclusion analysis.

124, 127 (2d Dep't 2019) (internal quotation marks omitted).  Because the requirements for collateral estoppel are satisfied here, MMA is precluded from arguing that it should not be bound by the arbitration clauses in the Form U-4s signed by Williams, Blankenship, and Anderson.

In *Ferguson*, MMA brought suit against its former employee, Elmer "Rick" Ferguson, after he solicited MMA's securities clients for a new employer, both while he was still employed at MMA and after he had resigned.  *See Ferguson*, No. 19 Civ. 3837, Dkt. 1 (*Ferguson* Complaint). MMA alleged several claims against Ferguson, including breach of contract (a non-solicitation agreement that Ferguson had signed), breach of duty of loyalty, misappropriation of confidential information, and unfair competition.  *See id.*  Ferguson moved to compel arbitration of those claims, arguing that MMA was equitably estopped from avoiding the arbitration clause in Ferguson's Form U-4—even though Ferguson signed the Form U-4 with MMA Securities and not MMA—because MMA had received a direct benefit from that agreement.  *See id.*, Dkt. 24 at 13-17.  On July 2, 2021, the Honorable Vernon S. Broderick issued the *Ferguson* Opinion, granting Ferguson's motion to compel arbitration.  *Ferguson* Opinion at 29-32.  Judge Broderick concluded that "MMA knowingly received a direct benefit from the Form U-4 and [was] estopped from avoiding its mandatory arbitration clause."  *Id.* at 29.

Here, Defendants argue that MMA should be forced to arbitrate its claims against them because it is bound by the arbitration clauses in the Form U-4s that Williams, Blankenship, and Anderson signed with JSL Securities.  Motion at 19-22.  Just as the defendant argued in *Ferguson*, Williams, Blankenship, and Anderson argue here that, as a nonsignatory to the Form U-4s, MMA should be bound to the arbitration clauses therein under an equitable estoppel theory.  In particular, Williams, Blankenship, and Anderson contend that MMA received a direct benefit from the Form U-4s.  *See* Motion at 17, 19-22; Defs. 2nd Supp. Br. at 1-3.  The resolution of this issue—which

was raised and litigated in *Ferguson*—is decisive here because, as in *Ferguson*, a determination that MMA is bound to arbitrate these claims will foreclose litigation in this forum. *Cf. Eastman Kodak Co. v. Asia Optical Co., Inc.*, No. 11 Civ. 6036 (DLC), 2012 WL 2148198, at *4 (S.D.N.Y. June 13, 2012) (explaining that a finding of a lack of jurisdiction is decisive in an action), *aff'd,* 518 F. App'x 23 (2d Cir. 2013).

The identity of issues between *Ferguson* and this case is undeniable. Both cases concern whether MMA should be compelled to arbitrate its claims against a former employee because of an arbitration clause contained in a Form U-4 that an employee signed along with one of MMA's security affiliates. The legal theory advanced by the movants—that MMA is bound to the Form U-4 as a nonsignatory because it directly benefitted from the Form U-4—is identical in both proceedings. The underlying facts also are parallels: in both instances, the employees were registered representatives providing securities services through an MMA securities affiliate, the employees and the MMA affiliate signed a Form U-4 with identical arbitration language,[17] MMA sought to pursue claims for breach of non-solicitation and confidentiality agreements in court, and the former employees argued that arbitration was mandated under the Form U-4s they had signed with MMA's securities affiliate.

Contrary to MMA's arguments, *see* MMA 2nd Supp. Br. at 2-3, it is of no moment that a different MMA securities affiliate—MMA Securities as opposed to JSL Securities—signed the Form U-4 in *Ferguson* than did here. Such an incidental factual difference does not change the nature of MMA's relationship to the Form U-4s that its employees signed with the affiliates. Judge Broderick concluded that MMA directly benefitted from the Form U-4 because Ferguson was

---

[17] *Compare Ferguson*, No. 19 Civ. 3837, Dkt. 25-6 at 14 (arbitration clause in Ferguson's Form U-4), *with* Form U-4s at 13 (Williams), 28 (Blankenship), 39 (Anderson).

required to have completed the Form U-4 to perform his work for MMA, and therefore Ferguson's employment with MMA was premised on his registration with FINRA.  *See Ferguson* Opinion at 29-32; *id.* at 29 ("Thus, as Plaintiff acknowledges, in order for Ferguson to work as an investment advisor for MMA and MMAS—the relationship out of which the claims here arise—Ferguson and MMAS had to fill out a Form U-4." (citation omitted)).  Here too, Williams, Blankenship, and Anderson would not have been able to perform certain work for MMA absent their status as registered representatives with FINRA.  *See* Blackmore Dep. Tr. at 188:15-18 (explaining that Williams "and his team" performed work that required a license from FINRA); Blankenship Dep. Tr. at 46:17-20, 56:2-60:6 (describing Defendants as employees of MMA); Blackmore Dep. Tr. at 54:1-4 (same); Plan Dep. Tr. at 14:14-16:22 (explaining that MMA purchased Defendants' securities business).  Moreover, the offer letters that MMA sent to Williams, Blankenship, and Anderson demonstrate that their employment was centered around, and dependent upon, their ability to perform FINRA-regulated activities.  *See* Sansbury Decl., Exh. M (providing that, upon employment with MMA, Blankenship's compensation would be entirely derived from his commission from "the sale of broker dealer products"); *see also* Motion at 19 n.11 (treating MMA's offer letter to Blankenship as exemplary of its offer letters to all Defendants).  The letter confirms that MMA extended offers of employment to those Defendants in reliance on the fact that they had registered with FINRA by signing Form U-4s.  Thus, like in *Ferguson*, Williams's, Anderson's, and Blankenship's employment with MMA was "premised on [their] registration with FINRA through [JSL Securities], not merely ancillary to it."  *Ferguson* Opinion at 32.

Similarly, while potentially relevant to an equitable estoppel inquiry, it is not dispositive to the analysis that Ferguson signed a renewed Form U-4 after he became employed by MMA, whereas Williams, Blankenship, and Anderson signed their Form U-4s prior to their employment

with MMA.  *See Ferguson* Opinion at 11; MMA 2nd Supp. Br. at 3.  "Under New York law, the
'guiding principle' of the [direct benefits theory of estoppel] 'is whether the benefit gained by the
nonsignatory is one that can be traced directly to the agreement containing the arbitration clause.'"
*Trina Solar US, Inc. v. Jasmin Solar Pty Ltd*, 954 F.3d 567, 572 (2d Cir. 2020) (quoting *Belzberg
v. Verus Invs. Holdings Inc.*, 999 N.E.2d 1130, 1135 (N.Y. 2013)).  That Williams, Blankenship,
and Anderson were registered through a different MMA subsidiary at a different time does not
change the nature of their relationship with MMA through the Form U-4s, or the benefit MMA
directly gained as a result of those Form U-4s.  "Identity of issues does exist," therefore, "because
the legal theory in both actions is the same and because there are no significant factual differences
between them."  *Kaufman v. Eli Lilly & Co.*, 482 N.E.2d 63, 68 (N.Y. 1985); *see also Zherka v.
City of New York*, 459 F. App'x 10, 13 (2d Cir. 2012) (summary order) ("To meet the identity-of-
issues prong of collateral estoppel, it is not necessary that the issues be exactly identical; it is
sufficient that 'the issues presented in the earlier litigation are substantially the same as those
presented by the later action." (alterations adopted) (quoting *ITT Corp. v. United States*, 963 F.2d
561, 564 (2d Cir. 1992))).

  MMA does not argue that it lacked "a full and fair opportunity to contest" Judge
Broderick's determination or that the issue of equitable estoppel was not "actually litigated and
resolved" in *Ferguson*.  *Russell*, 42 N.Y.3d at 384 (internal quotation marks omitted); *see generally*
MMA 2nd Supp. Br.  Nor could it.  When determining a party's ability to fully litigate an issue in
a prior proceeding, courts consider, among other factors, "the nature of the forum and the
importance of the claim in the prior litigation, the incentive and initiative to litigate and the actual
extent of litigation, the competence and expertise of counsel, the availability of new evidence, the
differences in the applicable law and the foreseeability of future litigation."  *Ryan v. New York Tel.*

*Co.*, 467 N.E.2d 487, 491 (N.Y. 1984).  In *Ferguson*, MMA had a full and fair opportunity to litigate the question of whether it should be equitably estopped from avoiding the arbitration clause in the Form U-4.  The matter was fully briefed, with MMA filing a comprehensive opposition arguing against estoppel, including contending that MMA did not derive a benefit flowing from Ferguson's Form U-4, and presenting legal theories to avoid arbitration.  *See Ferguson*, No. 19 Civ. 3837, Dkt. 43 (MMA opposition brief) at 13-17.  Judge Broderick even granted MMA an extension of time and of the page limit to ensure that MMA had a full opportunity to contest Ferguson's motion.  *See id.*, Dkt. 32.  There is no suggestion that MMA was deprived of procedural fairness or adequate representation, that it lacked motivation to vigorously contest the issue, or that it has discovered some significant piece of evidence that would almost certainly change the earlier result.  *See Schwartz v. Pub. Adm'r of Bronx Cnty.*, 246 N.E.2d 725, 729-30 (N.Y. 1969).

MMA does challenge the final requirement of collateral estoppel, however, arguing that "[t]he pertinent *Ferguson* Opinion and Order is not a final judgment on the merits," and so collateral estoppel should not apply.  MMA 2nd Supp. Br. at 2.  This argument reflects a misunderstanding of collateral estoppel's finality requirement.  "'Finality' within the meaning of collateral estoppel is a more flexible concept than it is in other contexts," and "[c]ritically, collateral estoppel is not limited to opinions that 'end the litigation and leave nothing for the court to do but execute the judgment.'"  *Ferring B.V. v. Serenity Pharms., LLC*, 391 F. Supp. 3d 265, 285 (S.D.N.Y. 2019) (alterations adopted) (quoting *Lummus Co. v. Commonwealth Oil Ref. Co.*, 297 F.2d 80, 89 (2d Cir. 1961)).  Indeed, "finality for the purposes of issue preclusion 'may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again.'"  *Rocky Aspen Mgmt. 204 LLC v. Hanford Holdings LLC*, No. 16 Civ. 4270 (VM), 2019 WL 3940218, at *4 (S.D.N.Y. July 29, 2019)

(quoting *Lummus*, 297 F.2d at 89); *see also* Restatement (Second) of Judgments § 13 (1982) ("[F]or purposes of issue preclusion . . . , 'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect."). Whether a ruling is sufficiently "final" for collateral estoppel purposes turns on "such factors as the nature of the decision (*i.e.*, that it was not avowedly tentative), the adequacy of the hearing, and the opportunity for review." *Lummus*, 297 F.2d at 89; *see also Ferring B.V. v. Serenity Pharms., LLC*, 391 F. Supp. 3d 265, 286 (S.D.N.Y. 2019) (describing "the numerous Second Circuit cases . . . that have reaffirmed *Lummus*'s fundamental holding that an interlocutory decision can be given preclusive effect"); *Weir v. Montefiore Med. Ctr.*, No. 24-1527, 2025 WL 289497, at *3 (2d Cir. Jan. 24, 2025) (applying the same collateral estoppel standards for "both federal common law and New York law"). Those considerations lead to the conclusion that the *Ferguson* Opinion is a "final" order for collateral estoppel purposes. Even if not yet appealable, Judge Broderick's decision was in no way tentative, *see Ferguson* Opinion at 27-32, and both parties extensively briefed the arbitration issue, having been granted extra time and pages to do so, with MMA raising many of the same arguments and citing many of the same cases as it does now, *compare Ferguson*, 19 Civ. 3837, Dkt. 43 at 13-15, *with* Opposition at 20-21, *and* MMA 2nd Supp. Br. at 2-3. *See Ferring B.V.*, 391 F. Supp. 3d at 285 (distinguishing between "an inability to obtain appellate review" for certain rulings and "temporarily unreviewable" interlocutory rulings, and finding the latter may be given preclusive effect (internal quotation marks omitted)); *id.* at 286 (applying the *Lummus* factors and concluding that a non-appealable order was final for collateral estoppel purposes); *Rocky Aspen Mgmt. 204 LLC v. Hanford Holdings LLC*, No. 16 Civ. 4270 (VM), 2019 WL 3940218, at *3-5 (S.D.N.Y. July 29, 2019) (same); *United States v. Walker*, 239 F. Supp. 3d 738, 740 (S.D.N.Y. 2017) ("Cases applying *Lummus* confirm that the availability of

appellate review is merely one factor to consider, and not a necessary condition, in evaluating the finality of a prior decision."). The *Ferguson* Opinion is thus a final order for purposes of collateral estoppel.[18]

Finally, MMA generally argues that it would be unfair to apply the doctrine of collateral estoppel in this case. *See* MMA 2nd Supp. Br. at 3. It is not clear that the fairness analysis applies where, as here, a party is using the doctrine of collateral estoppel defensively. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329-31 (1979) (distinguishing between offensive and defensive collateral estoppel, and discussing fairness in applying the doctrine only in the context of offensive collateral estoppel); *Bifolck v. Philip Morris USA Inc.*, 936 F.3d 74, 79-80, 84-85 (2d Cir. 2019) (same); *Weir*, 2025 WL 289497, at *3 (not analyzing fairness when applying collateral estoppel defensively). Regardless, none of the factors traditionally considered in assessing fairness point to the conclusion that it would be unfair to apply the doctrine against MMA. Judge Broderick's Opinion in *Ferguson* is not "itself inconsistent with one or more previous judgments in favor of [MMA]," *Parklane Hosiery*, 439 U.S. at 330, nor does this action provide MMA with "procedural opportunities . . . that could readily cause a different result," *id.* at 331. Similarly, there is no indication that MMA "had little to no incentive to raise the issue in the earlier action," and "the relative scope [and] complexity of the two actions" is comparable. *Bifolck*, 936 F.3d at 84 (internal quotation marks omitted).

---

[18] MMA cites to one district court decision within this Circuit that held an order was not final for the purposes of collateral estoppel. *See* MMA 2nd Supp. Br. at 2 (citing *Titan Mar. Indus., Inc. v. Marina Funding Grp., Inc.*, No. 99 Civ. 12087 (AKH), 2000 WL 1616991 (S.D.N.Y. Oct. 27, 2000)). That case, however, is inapposite. The prior order at issue in *Titan Maritime Industries* was one that merely "stayed the action, but did not compel arbitration," because under the Federal Arbitration Act, only a district in the forum selected by the arbitration agreement's forum-selection clause could compel arbitration. 2000 WL 1616991, at *1. Such a decision, purposefully designed to be revisited by another court, is a far cry from Judge Broderick's Opinion in *Ferguson*.

In sum, all elements of collateral estoppel are satisfied with respect to the issue of whether MMA received a direct benefit from a Form U-4 that its employee signed with a securities affiliate, such that MMA was bound to the arbitration clause in that document.  MMA is thus estopped from arguing that it should not be compelled to arbitrate its claims against Williams, Blankenship, and Anderson pursuant to the arbitration clause in the Form U-4s.

One issue remains.  Defendants acknowledge that Luketic never signed a Form U-4.  *See* Motion at 18 n.10.  Thus, no clause requires arbitration of MMA's claims against Luketic.  Where a "court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration."  *Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008) (citation omitted).  "It is well-settled that claims are appropriately stayed when they involve common issues of fact and law with those subject to arbitration or when the arbitration is likely to dispose of issues common to claims against both arbitrating and non-arbitrating defendants."  *Moore v. Interacciones Glob., Inc.*, No. 94 Civ. 4789 (RWS), 1995 WL 33650, at *7 (S.D.N.Y. Jan. 27, 1995).  MMA brings the same six causes of action against Luketic that it brings against Williams, Blankenship, and Anderson.  Given the unity of factual and legal issues, the Court stays MMA's claims against Luketic pending the outcome of the arbitration of MMA's claims against Williams, Blankenship, and Anderson.  *See Heller v. MC Fin. Servs. Ltd.*, No. 97 Civ. 5317 (WK), 1998 WL 190288, at *4 (S.D.N.Y. Apr. 21, 1998) (staying claims of an employee who had not signed a Form U-4 after compelling arbitration of claims of employees who had signed Form U-4s).

Accordingly, the Court grants Defendants' motion to compel arbitration with respect to MMA's claims against Williams, Blankenship, and Anderson.  This case is stayed pending the

resolution of that arbitration or until further order of this Court.[19]    Because the Court grants Defendants' request to compel arbitration as to those Defendants and stays the case, it does not address their alternative request to "stay this action during the pendency of the FINRA arbitration that Williams and Blankenship have initiated against MMA's securities affiliates" and two of their employees.    Motion at 22; *see id.* (requesting this relief only "[i]f the Court determines . . . that [MMA's] claims are not arbitrable").

## IV.  Conclusion

For the foregoing reasons, Defendants' motion to dismiss is denied, and Defendants' motion to compel arbitration is granted with respect to MMA's claims against Williams, Blankenship, and Anderson.    Those parties are ordered to commence arbitration before FINRA within sixty days of this filing.    This case is stayed pending the outcome of that arbitration or until further order of the Court.    The parties are directed to submit a joint status update not later than the earlier of (a) October 31, 2025, or (b) seven days after the culmination of the arbitration proceedings.    The Clerk of Court is respectfully directed to terminate the motion pending at Docket Number 58.

SO ORDERED.

Dated:  April 30, 2025
New York, New York

_____
JOHN P. CRONAN
United States District Judge

---

[19] The Supreme Court recently made clear that "[w]hen a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding."  *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024); *accord Katz v. Cellco P'ship*, 794 F.3d 341, 345 (2d Cir. 2015) ("We . . . consider a stay of proceedings necessary after all claims have been referred to arbitration and a stay requested. The FAA's text, structure, and underlying policy command this result.").